IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____
                                              )
CLASSEN IMMUNOTHERAPIES, INC.                 )
                                              )
                        Plaintiff             )
                                              )        Civil Action No.
v.                                            )
                                              )        WDQ 04 CV 2607
BIOGEN IDEC                                   )
GLAXOSMITHKLINE                               )
CHIRON CORPORATION                            )
MERCK & CO., INC.                             )
KAISER PERMANENTE VENTURES, et al.            )
                                              )
                        Defendants            )
_____)

PLAINTIFF'S  MEMORANDUM IN OPPOSITION  TO  MERCK'S
MOTION  FOR SUMMARY JUDGEMENT OF NON-INFRINGEMENT

    Plaintiff, Classen Immunotherapies, Inc., by and through the undersigned counsel, hereby

opposes Merck's Motion for Summary Judgement of Non-Infringement.

    Merck's motion should be denied substantively because Merck's motion is based upon a

fundamental misreading of U.S. patents 5,723,283, 6,420,139 and 6,638,739 and a

misapplication of the claims of the 5,728,385 patent.  When Merck's activities are compared to

properly construed claims of the patents in suit, infringement is clear.

    Merck's motion should be denied procedurally because (i) there has been no Claims

Construction determination by the Court  and therefore infringement cannot be determined; (ii)

Merck has not even proposed a construction for the claims in suit, (iii) Merck has not specified

which claims of which patents it believes are not infringed (iv) there are many material facts in

dispute, (v) Merck has provided no affidavit or declaration in support of the few material facts its

advances in its motion and (vi) there has been no scheduling order to provide for summary

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CLASSEN IMMUNOTHERAPIES, INC. ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | WDQ 04 CV 2607 |
| BIOGEN IDEC ) | |
| GLAXOSMITHKLINE ) | |
| CHIRON CORPORATION ) | |
| MERCK & CO., INC. ) | |
| KAISER PERMANENTE VENTURES, et al. ) | |
| ) | |
| Defendants ) | |

PLAINTIFF'S  OPPOSITION  TO  MERCK'S
MOTION  FOR SUMMARY JUDGEMENT OF NON-INFRINGEMENT

## TABLE OF CONTENTS

I.     PRE-REQUISITES  FOR  DETERMINATION OF
       PATENT  INFRINGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    DETERMINING  THE  MEANING  OF  PATENT  CLAIMS . . . . . . . . . . . . . . . . . . . . 5

III.   NEED FOR DISCOVERY AFTER A CLAIM CONSTRUCTION DECISION . . . . . . . 6

IV.    MERCK'S  POSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI.    THE  PATENT  CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VII.   DR.  CLASSEN'S  PATENT  IS  NOT  ONLY  CREDIBLE
       BUT IS SUPPORTED BY THE DeSTEFANO  STUDY . . . . . . . . . . . . . . . . . . . . . . . 12

VIII.  COMMUNICATION  BETWEEN  THE  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IX.    INFRINGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

X.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>TABLE OF CITATIONS</u>

*A.W. Industries, Inc. v. Electronic Connector Service, Inc.*, 46 U.S.P.Q.2d 1218 (1998)  . . . . . . 4

*Environmental Instruments, Inc. v. Sutron Corp.,* 877 F.2d 1561, 1564 (Fed.Cir. 1989)  . . . . . . 5

*Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 911 F. Supp. 76, 79 (E.D.N.Y. 1996)  . . . . . 4

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)  . . . . . . . . . . . . . . . . . . . . . . 4

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) . . . . . . . . . . . . . . 5, 6

*Vivid Technologies, Inc.,  v. American Science & Engineering, Inc.,*
     200 F.3d 795 at 806; 53 U.S.P.Q.2D (BNA) 1289 (Fed. Cir. 1999)  . . . . . . . . . . . . . . 4, 6

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612,
     49 U.S.P.Q.2D (BNA) 1333, 1337 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Lee, William F. and Krug, Anita K., <u>Still Adjusting to Markman: </u>
     <u>A Prescription for the Timing of Claim Construction Hearings,</u>
     13 Harv. J. Law & Tec. 55 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

judgement motions.

Further, Merck's Motion is at best a general request for partial summary judgement in that Merck only addresses "non-infringement" in a general sense and does not address discuss specific claims or claim language, direct infringement, induced infringement and/or contributory infringement as alleged in the Complaint.  Merck fails to specify the claims at issue and fails to discuss the specific elements of the claims that Merck believes are not found in its methods.

Merck's Motion must also fail because, instead of applying the claims of the patents to the activity of Merck,  Merck discusses the medical community's acceptance and/or lack of acceptance of Dr. Classen's work.  Merck attempts to present these arguments as evidence of non-infringement.  However, medical community acceptance of Dr. Classen's published papers is not relevant to the issue of patent infringement.   Merck first confuses opposing points of view within the medical community with the legal issues of invalidity and then mixes invalidity into its motion for non-infringement.  The patent claims pertain to "risk" which is the possibility of causation not "proof of causation" which is the focus of peer review and debate.

 Merck presents this legally incorrect argument because Merck cannot sustain a motion for non-infringement.  Merck's activities fall squarely within the scope of the claims of the Classen patents, however, it is too early in the litigation for a determination of infringement which can only be made after a determination of the meaning of the claims language.   Clearly from the misreading of the claims in suit, there are a number of claim terms which will need determination by the Court.[1]  Merck has not even proposed an interpretation for the claim language nor asserted that the language is without dispute.  Classen Exhibit A is the framework

---

[1] Classen Exhibit A attached hereto contains some examples of claim language in dispute.

within which the issue of claim construction will be presented for presentation to and

determination by the Court.  Not only will Merck and Classen have their positions presented to

the Court, but so will Biogen, GSK, Chiron and Kaiser.  The Court cannot make a claim

determination without providing an opportunity for all parties to be heard.


I.                    PRE-REQUISITES  FOR  DETERMINATION
                        OF  PATENT  INFRINGEMENT

        In addition to the usual summary determination requirements[2] that there are no material

facts in dispute,  in order to reach summary determination on the issue of infringement, a court

must first make a claims construction determination, preferably by conducting a claims

construction or Markman hearing[3] preceded by an exchange of documents, discovery, an

exchange of positions on claim language and briefing.   Prior to a claim construction hearing,

each party briefs its position on the meaning of the language used in the claims of the patent in

suit.  An evidentiary hearing is held and the Court determines the meaning of the claim language

to be applied to the accused infringing device.   "With most aspects of a trial hinging on this

_____

        [2]  When the moving party does not have the burden of proof on the issue that is the
subject of the summary judgment motion (the patentee bears the burden of proving infringement)
the movant nonetheless bears the initial burden of coming forward with sufficient evidence to
demonstrate that there is no material issue of fact that would preclude summary judgment, and
that it is entitled to judgment as a matter of law. If the movant meets its initial burden, the burden
of coming forward shifts to the party opposing the motion. The opposing party does not, at this
stage, have the burden of establishing that it is entitled to judgment in its favor; it need only
show either that the movant did not establish that it is entitled to judgment on undisputed facts or
on the opposer's version of the facts, or that there are material issues of fact which require
resolution at trial.  *Vivid Technologies, Inc.,  v. American Science & Engineering, Inc.,* 200 F.3d
795 at 806 (Fed. Cir. 1999)

        [3] The Markman Hearing derives it name from the Supreme Court case Markman v.
Westview Instruments,517 U.S. 370, 373 (1996).

determination -- 'now strictly a question of law for the court'-- a conscientious court will

generally endeavor to make this ruling before trial." (Loral Fairchild Corp. v. Victor Co. of

Japan, Ltd., 911 F. Supp. 76, 79 (E.D.N.Y. 1996) (CAFC Judge Rader sitting by designation,

internal citations omitted).   "Holding Markman hearings very early in the course of litigation is

undesirable and inefficient, as is holding them any time after opening arguments during the

infringement trial.  Rather, the optimal time for the claim construction hearing is, in most cases,

after discovery but before the trial begins." (Lee, William F. and Krug, Anita K., Still Adjusting

to Markman: A Prescription for the Timing of Claim Construction Hearings, 13 Harv. J. Law &

Tec. 55 (1999))

 After determining the meaning of the claim language, the Court can only then determine

if the language of the claims encompasses the structure of the accused device.

> The court's construction of the claims may lead to summary
> disposition of the issue of infringement when no material facts
> remain in dispute, or when the nonmovant can not prevail on its
> view of the facts. *Vivid Technologies, Inc.,  v. American Science &
> Engineering, Inc.,* 200 F.3d 795 at 806;  53 U.S.P.Q.2D (BNA)
> 1289 (Fed. Cir. 1999) citing *Voice Techs. Group, Inc. v. VMC Sys.,
> Inc.,* 164 F.3d 605, 612, 49 U.S.P.Q.2D (BNA) 1333, 1337 (Fed.
> Cir. 1999).

 In fact, most District Courts have special provisions in scheduling orders for patent cases

to allow for claim construction briefing.  For example the scheduling Order from Civil Action

MJG-01-3971 issued form the District Court for the District of Maryland, attached hereto as

Classen Exhibit  B, provides a section "C. Patent Matters"  which provides for briefing over a

twelve month period which culminates in a claims construction hearing in part C.8.f.

 To establish infringement, a two-step inquiry is performed:  (1) interpreting the claims,

followed by (2) comparing the properly interpreted claims to the accused device.  It is the Court's

responsibility to perform the construction of the patent claims first.  <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 373 (1996).   Next, this Court should apply the claims to the accused method.  If the method in question "embodies every limitation of the claim, either literally or by a substantial equivalent," the claim covers the method.  <u>A.W. Industries, Inc. v. Electronic Connector Service, Inc.</u>, 46 U.S.P.Q.2d 1218 (1998).

II.                          <u>DETERMINING  THE  MEANING  OF  PATENT  CLAIMS</u>

     The legal scope of a patent is defined by the claims of the patent.  <u>Environmental Instruments, Inc. v. Sutron Corp.</u>, 877 F.2d 1561, 1564 (Fed.Cir. 1989) The claims of a patent have a number of parts referred to as elements.

     When interpreting the meaning of the claims of a patent, the court first looks to the words of the patent itself and if the language is plain, the claims should be given their ordinary meaning. <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).   If there is any ambiguity, the Court next looks to the prosecution history of the patent.  The prosecution history of a patent is its administrative proceedings before an Examiner at the United States Patent and Trademark Office.  An applicant presents an invention and requests specific legal coverage for the invention in the form of originally presented claims.  The Examiner reviews the invention and the claims and makes a determination as to patentability.  The applicant and the Examiner then arrive at a set of claims which define the scope of the legal protection to which the applicant is entitled.  The prosecution histories of the four Classen patents are over two thousand pages of administrative proceedings which bear directly on the issues of claim construction and infringement.  None of this material has been discussed or even mentioned by

Merck.

Classen contends that the issue of infringement is not ripe for summary determination because there has been no Court construction of the claim language and there remain disputes as to the meaning of terms within the claims and there remain factual disputes as to the activities of Merck and clear factual disputes as to the whether the activities of Merck fall within the properly construed meaning of the elements of each of the 225 asserted claims of the four patents in suit.[4]

Although a claim construction is a question of law, this construction may rely on disputed extrinsic evidence for both claim construction and assertions of infringement, raising disputed factual issues which require an evidentiary hearing. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996)  Because of the generalized presentation of Merck's motion which lacks any analysis of the claim language, it is difficult to determine precisely which claim elements are in dispute and/or what extrinsic evidence will be presented and disputed.

III.        NEED FOR DISCOVERY AFTER A CLAIM CONSTRUCTION DECISION

What is clear however is that there is a great deal of dispute over the activities of Merck. Since most of these activities include the internal decision making process, they are solely within the custody and control of Merck.  Therefore, even if the Court could make a claim construction determination on each of the scores of claims at issue in each of the four patents in suit, summary

---

[4] In fact, Plaintiff has not yet identified with finality the asserted claims, typically the first step in the claim construction process.  As noted in the attached exemplary Scheduling Order EX B, this is typically not until five or six months after a scheduling order is issued.  The parties are still far away from a determination of infringement.

determination would not be appropriate until  Classen has had the opportunity to take discovery related to the construed claims.  *Vivid Technologies, Inc.,  v. American Science & Engineering, Inc.,* 200 F.3d 795;  53 U.S.P.Q.2D (BNA) 1289 (Fed. Cir. 1999)  In Vivid, a claim construction hearing was held and a claim construction decision was issued by the District Court, followed by the filing of a summary judgment motion.  The non-moving party sought discovery on the issue of infringement under FRCP 56(f).  The discovery was denied by the District Court but granted on appeal, through remand.   As in *Vivid*, the declaration of the non-movant Classen,  clearly demonstrates the need for discovery before a determination of infringement.

IV.                                      MERCK'S  POSITION

Merck first asserts that in order to infringe any of the claims of the Classen patents, Merck must have participated directly or indirectly in the Kaiser study.  Because Merck does not engage in the process of claim construction, they never address where in the claims this alleged restrictive language is found.   In order to even assert non-infringement, it is incumbent on the movant to cite to a specific limitation found explicitly in the claim and to distinguish the accused method over that specific limitation.  This is fundamental to patent law.

Merck also asserts that because its recommended schedule is the same as it was in 1991, there can be no infringement.[5]  This statement, even if it were true is not despositive of the issue of infringement.  As discussed below in relation to the claim language, it is not necessary for one to change a recommendation after evaluation.  It is only necessary to recommend a low risk schedule after evaluation, even if this is the same schedule as before evaluation.

_____

[5] We address below why this statement is not accurate.

This is a fundamental misreading of both the patents and the Complaint.  Plaintiff has never made the assertion in the Complaint  that participation in the DeStefano study was a necessary element of infringement and the claims of the Classen patents do not require participation in any study.   Merck's motion is also based up the incorrect assertion that the Merck schedule does not fall within the specific schedule limitations of the 5,728,385 patent.  In fact, the Merck schedule falls within the specific limitations of several claims of the 5,728,385 patent, for example claim 25:

| Claim 25 | Classen Proposed Claim Construction | Merck Proposed Claim Construction | Merck Accused Infringing Activity |
|---|---|---|---|
| 25. In a method for pediatric immunization against at least two infectious diseases, comprising administering at least one pharmaceutically acceptable dose of at least one pediatric vaccine to a mammal of at least 42 days of age, the improvement comprising: | one dose of vaccine after 6 weeks of age | ? UNKNOWN ? | First dose can be at any age |
| further administering to said mammal at least one pharmaceutically acceptable supraimmunogenic dose of at least one pharmaceutically acceptable vaccine prior to the age of 112 days of said mammal, wherein the further administration reduces the incidence of diabetes mellitis in a population and/or subpopulation of said mammals, | second dose prior to 4 months of age wherein clause not consider a claim limitation | ? UNKNOWN ? | Second dose 1 month later |

| where said mammal is a human, or an animal model of a human diabetes, and is not a streptozocin-treated mouse, and said mammal receives at least one of the following immunogens prior to age of 24 months: hepatitis B, hemophilus influenza B, mumps, rubella, chicken pox, acellular pertussis, and pneumococcus immunogens. | patient receives Hepatitis B vaccine prior to two years of age | ? UNKNOWN ? | vaccine is Hepatitis B given before two years of age |
|---|---|---|---|

       Without a proposed claim construction from Merck, it is not possible to know the theory by which Merck asserts non-infringement.

       Merck, although specifically distancing itself from the DeStefano study, never affirmatively states that it has not conducted nor participated in any other risk evaluations. Merck carefully leaves this as an implied fact.  A motion for summary judgement cannot survive on an implied fact.  Movant has a burden to come forward with a declaration or affidavit affirmatively stating that it has or has not done something.  Merck's motion is completely without any declaration from Merck in support of the motion.  It is also completely without any declaration as to how Merck arrives at its schedule recommendations.  The only assertion of the origin of the recommendations found in the Motion is attorney argument, which cannot sustain a motion for summary judgement.


V.                              <u>BACKGROUND</u>

       There are four Classen patents in suit, 6,420,139;  6,638,739; 5,728,385 and 5,723,283. Each of these patents is based upon the research of Dr. John Barthelow Classen, M.D.  (Classen Exhibit C, Classen Dec. ¶ 4)  Each of the four patents is based upon the clinical research and

review research of Dr. Classen and each patent claims priority to the Classen patent application

Serial Number 104,529 filed on August 12, 1993.  Dr. Classen's research lead him to invent, a

novel "Method and Composition for an Early Vaccine to Protect Against Both Common

Infectious Diseases and Chronic Immune Mediated Disorders or Their Sequelae."  Hence, each

of the patents in suit takes its title from this Classen discovery and the priority patent application.

(Classen Dec. ¶ 5)      Dr. Classen has had papers published which explain and document the

discoveries which lead to his invention.  The papers include:

> "The Timing of Pediatric Immunization and the Risk of Insulin-Dependent
>
> Diabetes Mellitus" co-authored with David Classen, MD and published in *Infectious*
>
> *Diseases Clinical Practice* in 1997 and
>
> "The timing of Immunization Affects the Development of Diabetes in Rodents"
>
> published in *Autoimmunity* in 1996.

Dr. Classen had uncovered a serious risk associated with the administration of vaccines.  Dr.

Classen's efforts were then and continue to be directed toward awareness of this risk and

reduction of the adverse effects associated with the administration vaccines according to a non-

preferred immunization schedule. (Classen Dec. ¶ 7)

The publication of Dr. Classen's work and a report on immunization risks aired by ABC

on World News Tonight, fueled a debate in the medical community which has included

Defendants, as well as The National Immunization Program of the Centers for Disease Control

and Prevention, The National Institutes of Allergy and Infectious Diseases and The Vaccine

Education Center of The Children's Hospital of Philadelphia, as well as many physicians and

clinical researchers. (Classen Dec. ¶ 8)  Dr. Classen developed techniques for reducing risks

associated with immunization and patented these techniques in the form of method claims in the

patents in suit.  Dr. Classen has not developed any vaccines, Dr. Classen invented methods for

reduction of the risks associated with immunization. (Classen Dec. ¶ 9)

The patent claims pertain to "risk evaluation" which is the *possibility* of causation not

*proof* of causation.   In order to infringe the claims of the patents in suit, the infringer need only

assess the risk of adverse effects, it is not necessary for the infringer to conduct its own clinical

trials or to prove  the cause of any adverse effects.   It is also not necessary for an infringer to

change its recommended schedule after assessment of risks.  If the risk assessment demonstrates

that the current schedule is the low risk schedule, maintenance of the current schedule is step II

of the Classen method.


VI.                           THE  PATENT CLAIMS

The 6,420,139 and 6,638,739 Classen patents are entitled "Method and Composition for

an Early Vaccine to Protect Against Both Common Infectious Diseases and Chronic Immune

Mediated Disorders or Their Sequelae."  The broad claims of the '139 and '739 patents contain

two steps[6]:

> (I) "screening a plurality of immunization schedules;" and

> (II) immunizing according to the lower risk schedule.

These two patents in suit do not require that the infringer conduct an actual trial of the

---

[6] The claims of the patents are extremely over simplified here in order to illustrate their
primary components for the purposes of this discussion.  Plaintiff does not intend to suggest that
satisfaction of the oversimplified claim language would constitute infringement.   An element by
element detailed analysis is necessary for validity and infringement analysis.  The full text of
each of the claims is found in the patents attached to the Complaint.

vaccine, nor do the claims require that the infringer conduct a study.  The language of the claims does not contain any step of "conducting a trial"  or "gathering data" or "performing a study" The claim only requires that alternatives are screened.  When the claims are properly construed, with reference to intrinsic evidence, it will be clear that screening of the trials, papers, records and/or studies of others is sufficient for the first step of infringement.  However, Merck's motion states that without direct participation in  the DeStefano study, Merck cannot infringe the claims of the patents in suit.  Merck makes this assertion without first proposing a construction of the claims which would support this conclusion.  This is precisely why a Markman hearing is necessary prior to any summary Judgement on infringement.

The 5,723,283 patent also contains two steps, immunization of a treatment group and comparison to a control group.  This is the only patent from which Merck recites a single claim.  However, the recitation of the claim is without any indication of any proposed construction for the Court.

The 5,728,385 Classen patent is also entitled "Method and Composition for an Early Vaccine to Protect Against Both Common Infectious Diseases and Chronic Immune Mediated Disorders or Their Sequelae." The claims of the '385 patent require only step (II), immunization. The claims do not require screening of two or more immunization schedules.   However, the claims recite a number of examples of preferred immunization schedules.  Each schedule differs dependant upon a number of vaccine factors, including the administration of vaccine individually or in combination.  Merck has again failed to propose any construction for any of these claims.

Infringement of the '283;  '139 and/or '739 patents does not require immunization

according to any particular schedule recited in the '385 patent.  Step (I) screening may lead to the

recognition of a different lower risk schedule of may confirm that the current schedule is the low

risk schedule.  Step (II) immunization would therefore be performed according to the schedule

recognized from the screening step I.


VII.          DR. CLASSEN'S PATENT IS NOT ONLY CREDIBLE
              BUT IS SUPPORTED BY THE DeSTEFANO STUDY

Dr. Frank DeStefano, Medical Epidemiologist, Center for Disease Control and

Prevention, in a March 6, 2002 letter to the journal Pediatrics, commenting on the work of Dr.

Classen, states:

>   "It may be worthwhile to continue to pursue research into possibly
>   preventing diabetes through vaccinations at birth, but our results
>   do not provide strong support for such research."
>   (Classen Exhibit D)

Dr. DeStefano states that he finds support for the Classen position, although he does not believe

that it is "strong support."  He does believe that it is strong enough to "be worthwhile to continue

to pursue research."  Dr. DeStefano is the first listed author of the publication "*Childhood

Vaccinations, Vaccination Timing, and Risk of Type I Diabetes Mellitus,*" cited in the Complaint.

Dr.  DeStefano's conclusion of "no support" in the article was challenged by Dr. Classen in a

peer review letter to the Pediatrics journal, dated March 3, 2002.   In response to Dr. Classen's

criticism, Dr. DeStefano had to modify his position, admitting there was support for Dr.

Classen's position but qualifying the support by stating that it was not "strong" support.  There is

a real dispute as to material facts at issue in this litigation.

The publication, "*Childhood Vaccinations, Vaccination Timing, and Risk of Type I*

*Diabetes Mellitus,*" (Merck Exhibit E) was written in response to Dr. Classen's work and determined relative risk of three different schedules, see Table 3 of the *Childhood Vaccinations* paper.   Table 3 of the study compares three different schedules (i) 0-14d; (ii) 15-55d; and (iii) >56d. The Table results demonstrate an OR for early vaccination of 0.59; an OR for 15 to 55 days of 0.69; and an OR for later vaccination of 0.86.  This Table from Kaiser's own study, demonstrates a 46% difference in odds ratio for Type 1 Diabetes.[7]   The publication purports to come to the conclusion that "we did not find an increased risk of type 1 diabetes associated with any of the routinely recommended childhood vaccines."   However, the Classen patents at issue are not about causation of a particular case of diabetes nor is this litigation about causation.  The patent are collectively about (i) comparing two or more vaccination schedules, (ii) determining if one of the schedules has a lower associated risk and (iii) immunizing according to the lower associated risk schedule.  The DeStefano paper admits that "Classen has provided the only evidence of a possible risk."   The January 30, 1995  FDA Report of Consultation (Merck Exhibit C) sums up with "The interagency group considered the investigator's hypothesis to be biologically plausible but as yet untested in animals or humans. . . .  Finally, this evaluation should be shared with other bodies concerned with vaccine safety, for appropriate consideration and actions."   Dr. Classen's theories, while not universally accepted, are considered credible.

Merck claims to be aware of the Classen papers, the DeStefano study and the FDA Report of Consultation. Therefore Merck has performed step (i), evaluate the relative risk.   The only step left for infringement, is to demonstrate that Merck takes the prudent course of action

---

[7] DeStefano does not provide any explanation for disregarding these numbers in making the statement "risk of type 1 diabetes was not different between infants vaccinated at birth and those who received their first vaccination later in life."

and immunizes according to the lower risk schedule, and in fact, Merck does recommend low risk immunization.

Merck, instead of addressing the issues in this patent litigation, attempts to raise a smoke screen by disparagement of Dr. Classen using an irrelevant and unpublished decision of a special master.  Dr. Classen was not a party to the unreported decision of *Baker v. Secretary of the Department of Health & Human Services*.  Dr. Classen was a witness for the petitioner in a case for compensation under the National Childhood Vaccine Injury Act.  This act creates a tribunal of extremely limited scope and jurisdiction, not at all comparable to nor consistent with Federal Court jurisdiction.  Under this Act, a petitioner can seek compensation for injuries which  were caused by a vaccine.  The Special Master determined that the petitioner, not Dr. Classen, failed to prove that the particular case of diabetes suffered by petitioner was the result of an adverse reaction to a particular vaccination.   The NCVIA found no direct causal link between a particular vaccination and the particular case of diabetes.  The NCVIA did not rule on the credibility of Dr. Classen's theory as a general risk reduction recommendation.

Merck asserts that no studies agree with the findings of Dr. Classen.  However, in addition to DeStefano's study, there are other studies which support Dr. Classen's work.  For example: *Vaccinations May Induce Diabetes-Related Autoantibodies in One-Year-Old Children*, published for the ABIS Study Group by the Division of Pediatrics, Department of Molecular and Clinical Medicine, Faculty of Health Sciences, Linkoping University, Linkoping, Sweden. (Classen Exhibit E)  This study concludes that: "We conclude that HIB vaccination may have an unspecified stimulatory polyclonal effect increasing the production of GADA and IA-2A."  Also, *Adverse Events Associated with Hepatitis B Vaccine in U.S. Children Less Than Six Years of*

*Age, 1993 and 1994,* from the West Virginia University, the West Virginia Department of Epidemiology and the University of Michigan, published in AEP which concluded: "Evidence from this study suggests that hepatitis B vaccine is positively associated with averse health outcomes in the general population of U.S. Children." (Classen Exhibit F)

VIII.                    <u>COMMUNICATION  BETWEEN  THE  PARTIES</u>

Contrary to the assertions of Merck, Plaintiff is now and has always been willing to meet with Merck to discuss the technical and legal issues in this matter so that both side's positions may be more fully understood.  In fact, Plaintiff's counsel contacted each of the defendants in an effort to set dates and times for meeting with each defendant individually and or all defendants together. (Classen Exhibit G)   Plaintiff's counsel communicated its desire to have meeting, not an exchange of position papers and legal opinions.  Merck is not the only defendant in this litigation.   In response to Plaintiff's counsel's efforts, Plaintiff  and counsel have meet in person with defendants other than Merck and their counsel, and have discussed the legal and technical positions of both sides in a productive manner.   Plaintiff is still willing and available to meet. Merck has not availed itself of this opportunity.   Plaintiff is of the strong belief that court ordered early pre-discovery mediation may be very productive in moving this matter forward to an understanding of the parties positions and to resolution.

IX.                         <u>INFRINGEMENT</u>

The DeStefano Declaration is not relevant to the issues of infringement as discussed herein, because participation in the DeStefano/Kaiser study is not an element of infringement. Further, this argument by Merck ignores the issues of contributory infringement and inducement.

Merck supplies other defendants (eg. Kaiser), practitioners, hospitals and the like with vaccines. Others, including Kaiser, test the safety risks of Merck vaccines, with the full knowledge of Merck.

Merck, by its own admission, advocates routine immunization and promotes a schedule for vaccination.  Merck, is one of the largest vaccine manufacturers in the world and advocates its vaccines be given according to a schedule.  Merck tests various other vaccine some of which are given according to the routine US immunization schedule that includes hepatitis B vaccine. Merck's claim that its 0, 1 and 6 month schedule, predates the patent at issue, is incorrect and immaterial to the issue of infringement.  The current recommendation of Merck, found in its prescription information, Classen Exhibit H  is not the same as the recommendation cited by Merck in exhibit K attached to its motion.    Merck Exhibit K recommends vaccination at birth then 2 months and 6 months of age or at  2 months of age, 4 months of age and 6 months of age. (Merck Exhibit K, CDC MMWR November 22, 1991; page 7 of 20, paragraph 2)  Merck summaries the recommendations of the Advisory Committee on Immunization Practices as:

> In 1991, the ACIP recommended a prevention strategy to eliminate hepatitis B including "making hepatitis B vaccine a part of routine vaccination schedules for all infants" beginning at birth regardless of any risk of hepatitis B infection.

According to Merck's own prescription information (Classen Exhibit H) the current recommended schedule is: "First dose: at an elected date. Second dose: 1 month later, Third dose 6 months after the first dose."  The prescription information document, Classen Exhibit H, cites several studies dated after the Classen patents, including citations 22, 30, 33, 34, 35, 36 and 37. Merck's assertion that its current prescription information is based solely on studies and recommendations which pre-date Classen is incorrect.   Cited reference #30 is the 1996 update to the 1991 recommendations of the Advisory Committee on Immunization Practices (Merck Exhibit K).   This particular reference #30 comes after the January 30, 1995 Report of Consultation of the Informal Consultation on Vaccines and Diabetes from a U.S. Public Health

Page - 17 - of  20

Service Inter-Agency Group, including NIH, CDC, FDA NVPO and DoD.  The Report was convened "to consider Dr. Bart Classen's hypothesis."   One of the preliminary conclusions stated in the report was:

>    Available information should be presented to the immunization
>    policy bodies concerned with issues of vaccine safety for
>    consideration.

One of the recommended "Next Steps" was:

>    3)    The Public Health Service should collect currently available data sources
>          on immunizations and diabetes for possible secondary evaluation of an
>          association between vaccines and/or immunization practices and IDDM."

The Summary states:

>    The interagency group considered the investigator's hypothesis to
>    be biologically plausible but as yet untested in animals or humans.
>    . . .  Finally, this evaluation should be shared with other bodies
>    concerned with vaccine safety, for appropriate consideration and
>    actions.

The prescription information also cites "10.  Data on file at Merck Research Laboratories." information clearly within the custody and control of Merck which is highly relevant to the issue of infringement.

There is plenty of evidence that Merck is infringing the patents.  At a minimum, there are numerous facts in dispute, yet Merck's motion makes no comparison of this activity to the claims of the patents in suit.

Infringement of a method claim is not the same as infringement of an apparatus claim. With an apparatus claim, there must be a final product which satisfies each of the elements of the claim, the same holds true for a product-by-process claim.   A method claim may also result in a final product.  However, it is not the final manufactured product which infringes, but the steps performed along the way.   The final product is not compared to the elements of the claim, the steps of the process are compared.  As long as the combination of steps satisfies the elements of

the claim, there is infringement regardless of the final product, if any.   The sum of the steps of a method claim is the direct infringement.

Just as the components of a product can be supplied by different legal entities (contributory infringers §271(c)), the steps of a method claim can be performed by different legal entities (contributory infringers §271(c)) so long as all of the steps are performed.   Any party inducing the manufacture of a patented item is an inducing infringer §271(b)and any party inducing others to perform the steps of a patented method is an inducing infringer §271(b) and any party taking advantage of the fact that others have performed earlier steps of a process is a contributory infringer §271(c).   There is no requirement that all of the method steps are performed by a single legal entity.   As long as all of the steps are performed and there is a relationship to the performance, §271(a) is satisfied.   If such were not the case, infringement of any method patent could simply be avoided by a transfer of the legal title to a product as it passed through the manufacturing process.

In this matter, infringement of the Classen patents at issue is evidenced by immunization of a pediatric patient by a doctor utilizing a schedule selected as low risk from a screening of at least two alternate schedules.   Infringement does not require that the doctor knows by whom the schedule was determined nor does it require that the legal entity screening the schedules know which doctors are following the correct immunization schedule.   Screening starts with the vaccine developers and the regulatory agencies, and  Merck is clearly included in this group.

In this matter, there is a complicated chain of activity leading to infringement.  Plaintiff has set forth the allegations sufficient to establish that Merck  is included in this chain.  Plaintiff intends to develop additional evidence during discovery to establish by preponderance of the

evidence that Merck is guilty of infringement of the Classen patents.

X.                              CONCLUSION

Merck infringes the claims of the patents in suit, however, Merck's Motion for Summary

Judgement is untimely and lacks necessary elements.  The Court must first construe the 225 total

claims that are in this matter before it can make a determination of infringement.  Merck must

present its version of material facts not in dispute and allow Classen to identify those that are in

dispute. The Court must resolve then resolve the materials facts which are in dispute, once they

are identified.

Merck must then compare its activities to the elements of the method claims as construed

by the Court.  This process requires position statements, agreed claim construction, identification

of elements in dispute, briefing and hearing.

                                    Respectfully Submitted;


                                    _____/s/_____
                                    Joseph J. Zito (Bar No. 05640)
                                    Kendal M. Sheets
                                    ZITO tlp
                                    26005 Ridge Road, Suite 203
                                    Damascus, Maryland 20872
                                    (301) 601-5010
                                    Attorneys for Plaintiff
                                    Classen Immunotherapies, Inc.

EXHIBIT   A

THE PATENTS IN SUIT

6,420,139

| Claim Language 6,420,139 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| 1.      A method of immunizing a mammalian subject while reducing the risk of said subject thereby developing at least one chronic immune-mediated disorder, which comprises: | | | | | | |
| (I) screening a plurality of immunization schedules, by | | | | | | |
| (a) identifying a first group of mammals and at least a second group of mammals, said mammals being of the same species, the first group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a first screened immunization schedule, and the second group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a second screened immunization schedule, each group of mammals having been immunized according to a different immunization schedule, and | | | | | | |

| Claim Language 6,420,139 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| (b) comparing the effectiveness of said first and second screened immunization schedules in protecting against or inducing a chronic immune-mediated disorder in said first and second groups, as a result of which one of said screened immunization schedules may be identified as a lower risk screened immunization schedule and the other of said screened schedules as a higher risk screened immunization schedule with regard to the risk of developing said chronic immune mediated disorder(s), | | | | | | |
| where the first dose of at least one infectious disease-causing organism associated immunogen given to both groups is given sooner after birth according to one or more of the screened immunization schedules than according to one or more of the other screened immunization schedules, each such immunogen so administered being hereafter referred to as an "early" immunogen regardless of its time of administration in the latter schedule(s), | | | | | | |

| Claim Language 6,420,139 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| where at least one of said chronic immune-mediated disorders is diabetes, | | | | | | |
| where said mammalian subject is or said mammals are humans, | | | | | | |
| where at least one of said early immunogens is one other than BCG or pertussis immunogen, and | | | | | | |
| (II) immunizing said subject according to a subject immunization schedule, according to which at least one of said early infectious disease-causing organism-associated immunogens is administered to the subject at about the same dates, relative to the date of birth as it was administered to the mammals in said lower risk screened immunization schedule, which administration is associated with a lower risk of development of said chronic immune-mediated disorder(s) than when said immunogen was administered according to said higher risk screened immunization schedule. | | | | | | |

Classen has also asserted claims 1, 2, 3, 4, 26, 28, 36, 37, 60, 63, 64 and/or 65 of the 6,420,139 patent and claims 5-25, 27, 29, 38-59, 62, 66-67, 69 and 70, based upon reasonable belief, subject to additional information anticipated during discovery which are also subject to claim construction.

6,638,739

| Claim Language 6,638,739 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| 1. A method of immunizing a mammalian subject which comprises: | | | | | | |
| (I) screening a plurality of immunization schedules, by | | | | | | |
| (a) identifying a first group of mammals and at least a second group of mammals, said mammals being of the same species, the first group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a first screened immunization schedule, and the second group of mammals having been immunized with one or more doses of one or more infectious disease-causing organism-associated immunogens according to a second screened immunization schedule, each group of mammals having been immunized according to a different immunization schedule, and | | | | | | |

| Claim Language 6,638,739 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| (b) comparing the effectiveness of said first and second screened immunization schedules in protecting against or inducing a chronic immune-mediated disorder in said first and second groups, as a result of which one of said screened immunization schedules may be identified as a lower risk screened immunization schedule and the other of said screened schedules as a higher risk screened immunization schedule with regard to the risk of developing said chronic immune mediated disorder(s), | | | | | | |
| (II) immunizing said subject according to a subject immunization schedule, according to which at least one of said infectious disease-causing organism-associated immunogens of said lower risk schedule is administered in accordance with said lower risk screened immunization schedule, which administration is associated with a lower risk of development of said chronic immune-mediated disorder(s) than when said immunogen was administered according to said higher risk screened immunization schedule. | | | | | | |

Classen has also asserted claims 1-6, 8-12, 16, 21, 25-28, 30, 31, 34, 35, 38-40, 42, 45, 46, 52, 53, 55-58, 62, 66-68, 71-73, 75-83, 85, 88-91, 96, 97, 109, 110, 112, and/or 113 of the 6,638,739 patent and claims 13-15, 19, 20, 22-24, 29, 32, 33, 36, 37, 41, 43, 44, 47-51, 54, 59-61, 63-65, 69, 70, 74, 84, 92-95, 98-103, 107 and 108, based upon reasonable belief, subject to additional information anticipated during discovery which are also subject to claims construction.

5,728,385

| Claim Language 5,728,385 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| 1. A method of immunizing a mammal less than 96 months of age against at least one infectious disease, while decreasing the incidence of an autoimmune disease, comprising | | | | | | |
| administering to said mammal one or more pharmaceutically acceptable pharmaceutical preparations, comprising one or more immunogens, according to an immunization schedule according to which, at specific times after birth, the mammal receives one or more pharmaceutically acceptable doses of one or more immunogens; | | | | | | |
| said mammal thereby receiving, for each said infectious disease, a suitable immmogen in such amounts, given at such ages, as to be effective to substantially prevent or substantially reduce the severity of such infectious disease; | | | | | | |

| Claim Language 5,728,385 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| said administering further resulting in an immune response in said mammal sufficient to substantially reduce the incidence of an autoimmune disease in such mammals; | | | | | | |
| said mammals are selected from the group consisting of humans, and nonhuman mammals which are animal models of a human autoimmune disease, | | | | | | |
| the first dose of said immunization schedule being administered when the mammal is less than 42 days old, measured from birth, | | | | | | |
| where, if only one immunogen is administered according to said immunization schedule, that immunogen is one other than BCG, | | | | | | |

| Claim Language 5,728,385 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| where, when all of the immunogens administered are selected from the group consisting of BCG, diphtheria, tetanus, whole cell pertussis, polio, hepatitis B, hemophilus influenza, measles, mumps and rubella immunogens, at least one of the following conditions applies: (a) immunogens are administered on at least three different dates prior to 42 days after birth, or (b) immunogens are administered on at least three different dates, and the maximum interval between administrations is about two weeks, or less, | | | | | | |
| where said autoimmune disease is selected from the group consisting of diabetes mellitis and systemic lupus erythrematosis. | | | | | | |

Classen has also asserted claims 1, 9, 12, 16, 17, 32 and/or 41 of the 5,728,385 patent and claims 2-6, 8, 10, 11, 13, 14, 15, 18, 25, 36, 39, 40, and 42, based upon reasonable belief, subject to additional information anticipated during discovery, which are subject to claims construction.

5,723,283

| Claim Language 5,723,283 | Classen Proposed Construction | Biogen Proposed Construction | GSK Proposed Construction | Chiron Proposed Construction | Merck Proposed Construction | Kaiser Proposed Construction |
|---|---|---|---|---|---|---|
| 1. A method of determining whether an immunization schedule affects the incidence or severity of a chronic immune-mediated disorder in a treatment group of mammals, relative to a control group of mammals, which comprises | | | | | | |
| immunizing mammals in the treatment group of mammals with one or more doses of one or more immunogens, according to said immunization schedule, and | | | | | | |
| comparing the incidence, prevalence, frequency or severity of said chronic immune-mediated disorder or the level of a marker of such a disorder, in the treatment group, with that in the control group. | | | | | | |

Classen has also asserted claims 1, 2, 4-6, 9, 10, 20-22, 25, 26, 29, 37, 38, 41, 46 and/or 47 of the 5,723,283 patent and claims 7, 8, 14-19, 23, 24, 31-16, 39, 42, 44, and 45, based upon reasonable belief, subject to additional information anticipated during discovery, which are subject to claims construction.

EXHIBIT  B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALFRED B. LEVINE                    *

            Plaintiff              *

            vs.                    *    CIVIL ACTION NO. MJG-01-3971

HEWLETT-PACKARD CORPORATION         *

            Defendant              *

*       *       *       *       *       *       *       *       *

## SCHEDULING ORDER

In accordance with the conference with counsel in this matter held on July 22, 2002:

   A.   General Matters

       1.   The parties shall seek to settle the case by November 1, 2002.

       2.   By December 1, 2002, any motion for joinder of additional parties and amendment of pleadings shall be filed.

       3.   The Court will demand compliance with the Local Rules. If you need to obtain a copy of the Local Rules, you may inquire of the Clerk for the identity of the various publishers who will sell you a copy.

       4.   This is an action in which Fed. R. Civ. P. 26(a)(1) does not apply. See Local Rule 104.10.

       5.   Any inquiries concerning the schedule should be directed to my chambers, not to the Clerk's Office. The original and two copies of all motions and memoranda should be filed with the Clerk. See Local Rule 105.1.

       6.   In any situation in which attorneys' fees may be sought by the prevailing party, counsel must be

familiar with the provisions of Local Rule 109.2
and the Rules and Guidelines for Determining
Lodestar Attorneys' Fees in Civil Rights and
Discrimination Cases which are Appendix B to the
Local Rules.

7.    Dates herein for filing or service are deadlines
for actual delivery to the adverse party or the
Clerk.

B.    Discovery

1.    Discovery (other than expert discovery) shall be
completed by July 1, 2003.

2.    This action is exempted from the requirements of
Fed. R. Civ. P. 26(d) and (f). See Local Rule
104.10. However, you are encouraged to confer with
one another immediately in order to:

a.    identify the issues,

b.    set a discovery plan,

c.    determine if the case can be resolved before
your clients incur further litigation
expense, and

d.    establish a cordial professional relationship
among yourselves.

3.    All of the provisions of Local Rule 104 apply,
including the following:

a.    All written discovery requests must be served
in time to assure that they are answered
before the discovery deadline. An extension
of the deadline will not be granted because
of unanswered discovery requests.

b.    The existence of a discovery dispute as to
one matter does not justify delay in taking
any other discovery. The filing of a motion
to compel or a motion for a protective order

will not result in a general extension of the
discovery deadline.

c.    No discovery materials, including Rule
      26(a)(1) and Rule 26(a)(2) disclosures,
      should be filed with the Court.  If they are,
      they will not be returned by the Clerk but
      will be destroyed.

d.    Motions to compel shall be filed in
      accordance with Local Rule 104.8.

e.    Please be familiar with the Discovery
      Guidelines of this Court adopted September
      11, 1995.  If you do not have a copy of the
      Guidelines, you may obtain one through the
      Clerk's Office.

4.    Expert discovery shall proceed as follows:

a.    By July 1, 2003, each party shall:

      (1)    Advise the adverse party of the identity
             of all proposed expert witnesses as to
             matters which the proposing party bears
             the burden of proof.

      (2)    Provide Rule 26(b)(2) information.

      (3)    Advise the adverse party of dates within
             30 days on which each expert shall be
             available for deposition so that
             depositions can be taken.

b.    By August 1, 2003, each party shall:

      (1)    Advise the adverse party of the identity
             of any proposed expert witnesses not
             identified in the previous submission.

      (2)    Provide Rule 26(b)(2) information.

      (3)    Advise the adverse party of dates within
             30 days on which each expert shall be

3

available for deposition so that
depositions can be taken.

C.   **Patent Matters**

1.   By December 1, 2002, Patent Owner shall file and
serve an Initial Disclosure of Asserted Claims and
must produce or make available for inspection and
copying the documents specified herein.

a.   The Initial Disclosure of Asserted Claims
shall contain the following information:

(1)   Identification of each claim of each
patent in suit that is allegedly
infringed by the Alleged Infringer(s);

(2)   Separately for each allegedly infringed
claim, each accused apparatus, product,
device, process, method, act or other
instrumentality (accused
instrumentality) of which the Plaintiff
is aware.  This identification shall be
as specific as possible.  Each product,
device and apparatus must be identified
by name or model number, if known.  Each
method or process must be identified by
name, if known, or by any product,
device or apparatus which, when used,
results in the practice of the claimed
method or process;

(3)   The date of conception and the date of
reduction to practice of each asserted
claim.

b.   At the time of filing the Initial Disclosure
of Asserted Claims, the Patent Owner must
produce or make available for inspection and
copying all documents relating to:

(1)   Any offers to sell each claimed
invention prior to the date of
application for the patent; and

4

(2)   Research, design, and development of
each claimed invention.

2.   By February 15, 2003, the Alleged Infringer(s)
shall serve and file an Initial Disclosure of
Prior Art and must produce or make available for
inspection and copying of documents described
herein:

a.   The Initial Disclosure of Prior Art shall
contain the following information:

(1)   Each item or prior art that the party
contends anticipates the claim or
renders it obvious;

(2)   For each item of prior art, whether it
anticipates the claim or renders it
obvious, if a combination of prior art
references renders a claim obvious, that
combination must be identified.

(3)   The identification of prior art must be
as specific as possible.  Each prior art
patent shall be identified by its
number, country of origin, and date of
issue.  Each prior art publication shall
be identified by its title, date of  .
publication, and, where feasible, its
author and publisher.  Prior art under
35 U.S.C. § 102(b) shall be identified
by specifying the item offered for sale
or publicly used, the date the offer or
use took place, and the identity of the
person or entity which made the use or
which made and received the offer.

b.   At the time of filing the Initial Disclosure
of Prior Art, the Alleged Infringer(s) must
produce or make available for inspection and
copying any source code, specifications,
schematics, flow charts, artwork, formulas or
other documentation on any accused
instrumentality.

5

3.    By May 15, Patent Owner shall file and serve a Claim Chart and Proposed Claim Construction Statement.

    a.    The Claim Chart shall contain the following information:

        (1)    Each claim of any patent in suit which the party alleges was infringed;

        (2)    The identity of each apparatus, product, device, process, method, art or other instrumentality of each opposing party which allegedly infringes each claim;

        (3)    Whether such infringement is claimed to be literal or under the doctrine of equivalents;

        (4)    Where each element of each infringed claim is found within each apparatus, product, device, process, method, act or other instrumentality; and

        (5)    If Patent Owner wishes to preserve the right to rely on his own apparatus product, device, process, method, act or other instrumentality as evidence of commercial success, the party must identify, separately for each claim, each such apparatus, product, device, process, method, act or other instrumentality that incorporates or reflects that particular claim.

    b.    The Proposed Claim Construction Statement shall contain the following information for each claim in issue:

        (1)    Identification of any special or uncommon meanings of words or phrases in the claim;

6

      (2)   All references from the specification that support, describe, or explain each element of the claim;

      (3)   All material in the prosecution history that describes or explains each element of the claim; and

      (4)   Any extrinsic evidence that supports that proposed construction of the claim, including, but not limited to, expert testimony, inventor testimony, dictionary definitions and citations to learned treatises, as permitted by law.

4.   By July 15, 2003, Alleged Infringer(s) shall file and serve a Responsive Claim Chart and Responsive Proposed Claim Construction Statement.

   a.   The Responsive Claim Chart shall contain the following information:

      (1)   The identity of each item of prior art that anticipates the claim or renders it obvious.  Each prior art patent shall be identified by its number, country of origin, and date of issue.  Each prior art publication shall be identified by its title, date of publication, and, where feasible, its author and publisher.  Prior art under 35 U.S.C. § 102(b) shall be identified by the item offered for sale or publicly used, the date the offer or use took place, the identity of the person or entity which made the use or which made and received the offer; and

      (2)   Whether it anticipates the claim or renders it obvious.  If a combination of prior art references makes a claim obvious, that combination must be identified;

7

(3)   Where, specifically, within each item of prior art each element of the claim is found;

(4)   All grounds of invalidity other than anticipation or obviousness of any of the claims listed in Claimant's Claim Chart.  This identification must be as specific as possible.  For example, if a best mode defense is raised, the adverse party must set forth with particularity what constitutes the inventor's best mode, specifically citing information or materials obtained in discovery to the extent feasible.  If an enablement defense is raised, the adverse party must set forth with particularity what is lacking in the specification to enable one skilled in the art to make or use the invention; and

(5)   If the claimant has alleged willful infringement, the date and a document reference number of each opinion of counsel upon which the party relies to support a defense to the willfulness allegation, including, but not limited to, issues of validity, and infringement of any patent in suit.

b.   The Responsive Proposed Claim Construction Statement shall contain the following information:

(1)   Identification of any special or uncommon meanings of words or phrases in the claim in addition to or contrary to those disclosed in the Proposed Claim Construction Statement;

(2)   All references from the specification that support, describe, or explain each element of the claim in addition to or contrary to those disclosed in the Proposed Claim Construction Statement;

8

(3)   All material in the prosecution history
that describes or explains each element
of the claim in addition to or contrary
to those disclosed in the Proposed Claim
Construction Statement; and

(4)   Any extrinsic evidence that supports the
proposed construction of the claim,
including, but not limited to, expert
testimony, inventor testimony,
dictionary definitions and citations to
learned treatises, as permitted by law.

5.   Amendment of a Claims Chart or a Responsive Claims
Chart may be made only on stipulation of all
parties or by Order of the Court, which shall be
entered only upon a showing of excusable
subsequent discovery of new information or
extraordinary good cause.

6.   By August 1, 2003, the parties shall meet and
confer for the purpose of preparing a Joint Claim
Construction Statement.

7.   By August 22, 2003, the parties shall file a Joint
Claim Construction Statement, which shall contain
the following information:

a.   The construction of those claims and terms on
which the parties agree;

b.   Each party's proposed construction of each
disputed claim and term, supported by the
same information that is required in the
respective claim construction statements;

c.   For any party who proposes to call one or
more witnesses at any claims construction
hearing, the identity of each such witness,
the subject matter of each witness' testimony
and an estimate of the time required for the
testimony.

9

8.   Claims construction issues shall be resolved as follows:

    a.   By October 1, 2003, Patent Owner shall file and serve an opening brief with supporting evidence and identification of any proposed <u>Markman</u> hearing witnesses.

    b.   By November 15, 2003, Alleged Infringer(s) shall file and serve a responsive brief with supporting evidence and identification of any proposed <u>Markman</u> hearing witnesses.

    c.   By November 22, 2003, Patent Owner shall file and serve any reply brief and supporting evidence directly rebutting Patent Owner's supporting evidence and identification of any proposed <u>Markman</u> hearing rebuttal witnesses.

    d.   By December 1, each party shall file under seal and serve  a video tape of no more than 30 minutes that includes:

        (1)   A description including a description of the technology at issue and a summary of the party's's primary factual and legal positions.

        (2)   The video tapes should not be productions but, rather, only what is sufficient to be clear.

    e.   By December 8, 2003, each party shall serve (<u>ex parte</u>) and file under seal, a letter of no more than five pages commenting on the other party's tape.

    f.   There shall be a claims construction hearing on Friday, December 13, 2003 (and/or such other dates as may be necessary) commencing at 10:00 a.m.

D.   Summary Judgment Motions

10

1.    Any dispositive motions shall be filed no later
      than 15 days after the Court's ruling on claims
      construction issues.

2.    The parties may, but need not, file dispositive
      motions that are not affected by claims
      construction at any time prior to 15 days after
      the Court's ruling on claim construction.

3.    If more than one party intends to file a summary
      judgment motion, the provisions of Local Rule
      105.2.c shall not apply.

4.    A hearing on summary judgment motions shall be
      scheduled if necessary.

So ORDERED this _____5th_____ day of August, 2002.

 

 

Marvin J. Garbis
United States District Judge

EXHIBIT  C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

|  |  |  |
|---|---|---|
| CLASSEN IMMUNOTHERAPIES, INC. | ) |  |
|  | ) |  |
| Plaintiff | ) |  |
|  | ) | Civil Action No. |
| v. | ) |  |
|  | ) | WDQ 04 CV 2607 |
| BIOGEN IDEC | ) |  |
| GLAXOSMITHKLINE | ) |  |
| CHIRON CORPORATION | ) |  |
| MERCK & CO., INC. | ) |  |
| KAISER PERMANENTE VENTURES, et al. | ) |  |
|  | ) |  |
| Defendants | ) |  |

_____


DECLARATION OF DR. JOHN BARTHELOW CLASSEN


I, John Barthelow Classen, M.D., M.B.A. declare and state to the best of my own perosnal information, knowledge and belief,  as follows

1.      I am a medical doctor and Licensed Physician in Maryland, Delaware, District of Columbia, Virginia, West Virginia currently practicing in Maryland.  I have conducted research into vaccine induced diabetes and have published numerous papers and articles and have made presentations to various medial groups concerning my findings.

2.      I am the named inventor of the four patents in suit related to a method of evaluation of adverse risk factors related to vaccines and for determination of a vaccine immunization schedule which provides the appropriate protection against a disease while maintaining a desired level of adverse risk.

3.      My patents protect the act of taking into consideration the probability of adverse events when determining an immunization schedule.  They are not limited to a particular immunization schedule.

4.      There are four Classen patents in suit, 6,420,139;  6,638,739; 5,728,385 and 5,723,283.  Each of these patents is based upon my research.  Each of my patents is based upon my clinical research and review research.

5.      My research lead me to invent, a novel "Method and Composition for an Early

Vaccine to Protect Against Both Common Infectious Diseases and Chronic Immune Mediated Disorders or Their Sequelae."

6.      I have had papers published which explain and document the discoveries which lead to this invention.  The papers include:
          "The Timing of Pediatric Immunization and the Risk of Insulin-Dependent Diabetes Mellitus" co-authored with David Classen, MD and published in *Infectious Diseases Clinical Practice* in 1997 and
          "The timing of Immunization Affects the Development of Diabetes in Rodents" published in *Autoimmunity* in 1996.

7.      I uncovered a serious risk associated with the administration of vaccines.  I have continued my efforts toward awareness of this risk and reduction of the adverse effects associated with the administration vaccines according to a non-preferred immunization schedule.

8.      The publication of my work and a report on immunization risks aired by ABC on World News Tonight, fueled a debate in the medical community which has included Defendants, as well as The National Immunization Program of the Centers for Disease Control and Prevention, The National Institutes of Allergy and Infectious Diseases and The Vaccine Education Center of The Children's Hospital of Philadelphia, as well as many physicians and clinical researchers.

9.      I have not developed any vaccines, I have invented methods for reduction of the risks associated with immunization.  The patent claims pertain to "risk evaluation" which is the *possibility* of causation not *proof* of causation.

10.     An example of the consideration of adverse events having an impact upon recommended produce use is Vioxx.  Once Merck was willing to consider that Vioxx may be associated with heart disease they acted differently, they pulled the product from the market acknowledging risk but denying proof of any causal link. They are considering bringing the drug back on the market for those will low risk of heart disease. The issue is considering risk and acting on information.

11.     In providing vaccines, Merck is inducing people to make comparisons and then deal with the risk benefit of different immunization schedules.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.


_____                    _____
Date                                      Dr. John Barthelow Classen, M..D., M.B.A.

# EXHIBIT  D



QUICK SEARCH:                    [advanced]
Author:        Keyword(s):
Go
Year:        Vol:        Page:

Post-publication Peer Review (P$^3$R) is an online forum for ongoing peer review. When an article is eligible for P$^3$R, a link to the response form is available within the full-text article. You must be a current subscriber who has activated the online portion of your subscription in order to send a P$^3$R. Any reader can read published P$^3$Rs.

## Post-publication Peer Reviews to:

ELECTRONIC ARTICLE:
Frank DeStefano, John P. Mullooly, Catherine A. Okoro, Robert T. Chen, S. Michael Marcy, Joel I. Ward, Constance M. Vadheim, Steve B. Black, Henry R. Shinefield, Robert L. Davis, and Kari Bohlke

▶ P$^3$Rs: **Submit a response** to this article

**Childhood Vaccinations, Vaccination Timing, and Risk of Type 1 Diabetes Mellitus**
Pediatrics 2001; 108: e112 [Abstract] [Full text]

## P$^3$Rs published:

▼ **CDC data support association between vaccines and IDDM**
   John B Classen   (3 March 2002)
▼ **Childhood vaccinations and type 1 diabetes**
   Frank DeStefano   (6 March 2002)

---

## CDC data support association between vaccines and IDDM

3 March 2002    

John B Classen,
Physician
*Classen Immunotherapies*

Send letter to journal:
Re: CDC data support association between vaccines and IDDM

Email John B Classen

DeStefano et al. (1) recently published a paper in which they reference our work. We estimated that the 4 doses of the hemophilus influenza B vaccine increased the risk of IDDM, relative risk 1.17, P<0.05, based on 10 years of follow up of a large clinical trial (2). Our data indicated the risk of vaccine induced IDDM exceeded the benefit by 3 to 1. DeStefano's data indicated an identical risk, odds ratio 1.14 or 1.23 depending on their regression analysis. We also found the incidence of IDDM rose in Finland about 60% percent following the introduction of the MMR vaccine in 1982 and the Hemophilus vaccine in 1986 (3). DeStefano's data on the combined odds ratio of the hemophilus vaccine and the MMR vaccine (1.14*1.36=1.55 OR) support our conclusion that vaccines can explain the 60% rise. DeStefano erroneous concludes his findings do not support our data and conclusions. Clearly it is not in the public interest to deny that vaccines can explain the rise in IDDM.

Case control studies like DeStefano's and others also do not adjust for the confounding effects of several different vaccines that can have opposing effects on the development of IDDM. For example patients born in 1994 may have received the hepatitis B vaccine at birth, which is associated with a decreased risk, but also have received a HiB vaccine which is associated with an increased risk. By contrast our studies have involved large cohorts which only differed by a single vaccine. We have also found that the increased risk of IDDM associated with most vaccines does not occur until three years after immunization. A finding supported by published literature There may not have been sufficient time of follow up for DeStefano to see an increased risk of IDDM with certain vaccines.

In conclusion the study by DeStefano and other studies he cites just prove that small case control studies in highly immunized populations will not lead to an statistical significant association even when clinically significant end points are reached. Large cohort studies on 100,000 patients or more are needed. The fact that DeStefano found the hemophilus and MMR vaccines associated with risks near identical to what we found in cohort studies is supportive of our conclusions. The finding that immunization with the Hepatitis B vaccine starting at birth is associated with an odds ratio well below 1 (0.51) is also consistent with our findings and needs to be studied further.

References:

1. DeStefano F, Mullooly JP, Okoro CA, et al. Childhood vaccinations, vaccination timing, and risk of type 1 diabetes mellitus. Pediatrics 2001;108:e112.

2. Classen JB, Classen DC. Association between type 1 diabetes and Hib vaccine, causal relation likely. BMJ 1999;319:1133.

3. Classen DC, Classen JB. The timing of pediatric immunization and the risk of insulin-dependent diabetes mellitus. Infectious Diseases in Clinical Practice 1997;6:449-54.

4. Sultz HA, Hart BA, Zielezny M, Schlesinger ER. Is the mumps virus an etiologic factor in juvenile diabetes mellitus. J. Pediatrics 1975, 86:654-656.

5. Hyoty H, Leinikki P, Reunanen A et al. Mumps infection in the etiology of type 1 diabetes. Diabetes Res 1988, 9:111-116.

Author: John Barthelow Classen M.D., M.B.A. President and Chief Executive Officer Classen Immunotherapies, Inc. 6517 Montrose Avenue Baltimore, MD 21212 U.S.A. E-mail: Classen@vaccines.net Tel: (410) 377-4549 Fax: (410) 377-8526
.

## Childhood vaccinations and type 1 diabetes

6 March 2002    

Frank DeStefano,
Medical epidemiologist
*Centers for Disease
Control and Prevention*

Send letter to journal:
Re: Childhood
vaccinations and type 1
diabetes

Email Frank DeStefano

The reference Classen cites in support of his claim that Haemophilus influenzae type B (Hib) vaccine increases the risk of developing type 1 or insulin-dependent diabetes mellitus (IDDM) with a relative risk of 1.17 is actually a letter to the editor. We are not aware that his analysis has ever been published in a peer-reviewed publication. The data are from a follow-up study of a cohort of children who participated in a national Hib clinical trial in Finland. The definitive analysis of the follow-up study was published by Karvonen (1) and no statistically significant increased risk of type 1 diabetes was found to be associated with Hib vaccination or with age at vaccination. An editorial by Elliman (2) accompanying the Karvonen paper concluded that, "This was a well designed and very carefully conducted study whose metholology cannot be criticised, so we can be reassured about the validity of the findings." The contention that the relative risks of 1.14 (unadjusted) and 1.23 (adjusted) from our case-control study (3) are similar to the 1.17 relative risk noted by Classen, completely ignores the wide 95% confidence intervals that extend down to 0.5 on the lower end for both estimates. As we noted in our paper, the relative risk estimates from our study were too unstable for Hib vaccine and we feel Karvonen's study provides the most reliable data on this question. Since the publication or our study, we have become aware of another large multicenter European case-control study of vaccines and type 1 diabetes (4). The study included 900 cases of type 1 diabetes and 2302 controls. The relative risk for Haemophilus influenzae vaccine adjusted for potentially confounding risk factors was 0.75 (95% confidence interval, 0.30-1.92), providing additional evidence of a lack of an increased risk of type 1 diabetes associated with Hib vaccine.

Next, Classen claims that the incidence of IDDM in Finland increased by about 60% following the introduction of MMR vaccine in 1982 and Hib vaccine in 1986. He failed to mention, however, that the incidence of type 1 diabetes in Finland has been increasing

virtually linearly since the 1960's (1). Classen goes on to speculate that the combined effects of Hib and MMR vaccine may increase the risk of diabetes by 60%. He arrived at this figure by multiplying the two non-statistically significant odds ratios from our study of 1.14 for Hib and 1.36 for MMR. There is no support for a possible increase in risk associated with either vaccine from any other study. The Karvonen study did not find an increase in risk associated with Hib vaccine and the only other study with data on MMR, a large case-control study from Sweden (5), found an odds ratio of 0.95 (95% confidence interval, 0.71-1.28). Thus, the weight of the epidemiological evidence is that neither MMR nor Hib increases the risk of type 1 diabetes and, without evidence to the contrary, there is no reason to expect that their combined effects would be any different. We were not able to study the simultaneous effects of the two vaccines in our study because too few children were not vaccinated with either vaccine.

There are no references to the claim that "... the increased risk of IDDM associated with most vaccines does not occur until three years after immunization." Classen further asserts that there may have not been sufficient time of follow-up in our study to see an increased risk of IDDM with certain vaccines. As noted in our manuscript, half of our cases and controls were followed up until at least age 4 years, with a maximum of 10 years. Thus, a large number of children in our study had more than 3 years of follow-up after vaccination with the common infant vaccines.

Next, Classen attempts to discount our study and other previous studies as "small case-control studies" in highly immunized populations. Certainly, that most children in our study had received MMR and Hib limited our ability to obtain precise relative risk estimates for these vaccines. However, there have been other large case-control studies of these vaccines that had large proportions of unvaccinated subjects and provide stable estimates of relative risk. The Swedish case-control study (5) which found an odds ratio of 0.95 (0.71-1.28) for MMR vaccine had 339 cases and 528 controls, with over 50% of both case and control children not having received MMR vaccine. The european multicenter study (4) that found no increased risk associated with Hib vaccine included 900 cases and over 2000 controls.

Finally, Classen states that our results for hepatitis B vaccine are consistent with his findings and support the need for additional research on possible decreased risk of type 1 diabetes associated with immunizing against hepatitis B at birth. Again, Classen is very selective in the result he chose to emphasize. Although we did find that the unadjusted odds ratio for hepatitis B vaccination at birth was 0.51 compared with unvaccinated children, the result was not statistically significant (95% confidence interval, 0.23-1.15). Moreover, the odds ratio was less than 1.0 for children who were vaccinated at later ages. In adjusted analyses, the odds ratio for children who were vaccinated against hepatitis B at birth, 0.66 (0.27- 1.59) was not greatly different than the odds ratio for children who were first vaccinated at 2 months of age or later, 0.74 (0.45-1.21). It may be worthwhile to continue to pursue research into possibly preventing diabetes through vaccinations at birth, but our results do not provide strong support for such research.

References

1. Karvonen M, Cepaitis Z, Tuomilehto J. Association between type 1 diabetes and Haemophilus influenzae type b vaccination: birth cohort study. BMJ 1999;318:1169-1172.

2. Elliman D. Vaccination and type 1 diabetes mellitus. BMJ 1999;318:1159-1160.

3. DeStefano F, Mullooly JP, Okoro CA, et al. Childhood vaccinations, vaccination timing, and risk of type 1 diabetes mellitus. Pediatrics 2001;108:e112.

4. The EURODIAB Substudy 2 Study Group. Infections and vaccinations as risk factors for childhood Type 1 (insulin-dependent) diabetes mellitus: a multicentre case-control investigation. Diabetologia 2000;43:47-53.

Case 1:04-cv-00260-TWDQ 1 Document 66    Filed 06/09/05    Page 53 of 83

5. Blom L, Nystrom L, Dahlquist G. The Swedish childhood diabetes study: Vaccinations and infections as risk determinants for diabetes in childhood. Diabetologia 1991;34:176-181.

SUBSCRIPTIONS   FUTURE CONTENTS   CURRENT ISSUE

Copyright © 2004 by the American Academy of Pediatrics. [Disclaimer]

EXHIBIT  E

# Vaccinations May Induce Diabetes-Related Autoantibodies in One-Year-Old Children

J. WAHLBERG, J. FREDRIKSSON, O. VAARALA, AND J. LUDVIGSSON
FOR THE ABIS STUDY GROUP

*Division of Pediatrics, Department of Molecular and Clinical Medicine,
Faculty of Health Sciences, Linköping University, Linköping, Sweden*

ABSTRACT: Vaccinations have been discussed as one among many environmental candidates contributing to the immune process that later may lead to type 1 diabetes. ABIS (All Babies in Southeast Sweden) is a prospective cohort study following a nonselected birth cohort of general population. In a randomly selected sample collection from 4400 children, GADA and IA-2A have been determined at the age of 1 year. The information on vaccinations was collected from questionnaires answered by the parents and was related to β cell auto-antibodies. When studying the induction of autoantibodies using the autoanti-body level of 90th percentile as cutoff level, hemophilus influenza B (HIB) vaccination appeared to be a risk factor for IA-2A [OR 5.9 (CI 1.4–24.4; $p = 0.01$)] and for GADA [OR 3.4 (CI 1.1–10.8; $p = 0.04$)] in logistic regression analyses. Furthermore, the titers of IA-2A were significantly higher ($p < 0.01$ in Mann-Whitney test) in those children who had got HIB vaccination. When 99th percentile was used as cutoff to identify the children at risk of type 1 diabetes, BCG vaccination was associated with increased prevalence of IA-2A ($p < 0.01$). We conclude that HIB vaccination may have an unspecific stimulatory polyclonal effect increasing the production of GADA and IA-2A. This might be of importance under circumstances when the β cell–related immune response is activated by other mechanisms.

KEYWORDS: ABIS; children; diabetes; autoantibodies; BCG vaccination; HIB vaccination

The incidence of type 1 diabetes (T1D) in children is increasing rapidly in many countries all over the world.[1] This fact, as well as the remarkable difference in incidence of T1D in children in neighboring countries like Finland and Estonia, with rather similar genetic background in the populations, shows that environmental factors have to play an important role for the development of the disease. Next to Finland, Sweden has the highest incidence of T1D in children in the world and, therefore, environmental factors should be sought for in our country. The age at onset of T1D has decreased in recent years,[2] which strongly suggests that we should look for environmental factors influencing very young children. As manifest diabetes is the end result of a rather long disease process, studies of factors eliciting or influencing

Address for correspondence: Johnny Ludvigsson, Division of Pediatrics, Department of Molecular and Clinical Medicine, Faculty of Health Sciences, Linköping University, SE-581 85 Linköping, Sweden. Voice: +46-13-22-13-33; fax: +46-13-14-82-65.
johnny.ludvigsson@lio.se

Ann. N.Y. Acad. Sci. 1005: 404–408 (2003). © 2003 New York Academy of Sciences.
doi: 10.1196/annals.1288.068

404

the very early phase of the autoimmune process have special importance. Diabetes-related autoantibodies such as antibodies against glutamic acid decarboxylase (GADA) and against tyrosine phosphatase (IA-2A) have been shown to be good markers for the disease process sometimes leading to autoimmune diabetes.[3,4] It is thus rational to study how environmental factors influence the development of T1D-associated autoantibodies. The risk for T1D is increased in families with first-degree relatives having T1D; therefore, several studies, such as BabyDiab and DiabFin, have focused on following the first-degree relatives of patients. Another population with increased risk for T1D comprised children with disease-associated HLA risk genotypes, who are studied in other projects, such as the DIPP study and the DAISY project. Our aim is to identify environmental factors associated with β cell auto-immunity by looking at the whole general population, not least those children without high genetic risk, even though they rarely proceed to manifest diabetes. ABIS (All Babies in Southeast Sweden) included 17,055 out of 21,700 newborns (78.6%) in a geographical area with high diabetes incidence. The project was approved by the Research Ethics Committees at the Faculty of Health Sciences, Linköping University, and at the Medical Faculty, Lund University, Sweden.

Among many environmental factors suspected to have a diabetogenic effect, vaccinations have been an interesting candidate.[5] Mumps, hemophilus influenza B (HIB), and pertussis vaccines have been suggested to be associated with the risk of T1D, whereas bacille Calmette-Guérin (BCG) vaccine has been suggested to have a protective effect on the development of T1D.[6] Many other studies have been unable to find any association between vaccinations and increased risk of T1D,[7–13] whereas others obtained results indicating that vaccinations may be a risk factor.[14] However, the information is scarce so far regarding the effect of vaccinations on very early autoimmune response. Thus, it was our aim to elucidate this question.

## MATERIALS AND METHODS

Among the ABIS population, a random sample of 4400 1-year-old children was selected. According to the design of the ABIS project, capillary blood samples are taken from the children at the age of 1 year and, at that time point, the parents also answer a questionnaire including questions on vaccinations. As most parents in Sweden follow the recommendations regarding the general vaccination program, it was not expected to find other than exceptional cases not having got vaccinations like tetanus, diphteria, polio, mumps, rubella, and morbilli. However, BCG vaccination against tuberculosis is not generally recommended, but given mainly to children with parents born or traveling abroad. HIB vaccination and pertussis vaccination have been introduced in recent years. Thus, we can expect to get a group of children without one or the other of those latter three vaccinations before the age of 1 year.

As the marker of diabetes-related autoimmunity, we use GADA and IA-2A, which have been determined by an immune precipitation method using methionine-labeled antigens. The method is described in detail elsewhere[15] and in the DASP (Diabetes Autoantibody Standardization Program) for 2002. Using the autoantibody level of 99th percentile as cutoff for positivity, our methods showed specificity of 96% for GADA and 100% for IA-2A, whereas the sensitivity was 82% for GADA and 54% for IA-2A. Intra-assay coefficient of variation was 5.2% and interassay variation was 13–18%.

The register data in relation to autoantibody data have been analyzed statistically first using univariate analysis (cross-tabulations, Pearson chi-square test, two-sided). Stepwise forward logistic regression was used for factors shown to be significant ($p < 0.05$). Statistics were calculated on a PC using the SPSS 11.0 software.

## RESULTS

The 99th percentile cutoff for positivity in our study population corresponds to 40.8 WHO units for IA-2A and 106.6 WHO units for GADA. The 90th percentile cutoff for positivity in our study population corresponds to 32.8 WHO units for IA-2A and 92.3 WHO units for GADA.

Only 1841 out of 4400 answered the question regarding BCG. We found that 5 of 39 who had IA-2A above the 99th percentile had got the BCG vaccination, whereas only 183 of 1828 who had IA-2A levels below the 99th percentile had got BCG vaccination ($p < 0.01$). When the 90th percentile was used as cutoff for detection of β cell autoantibodies, HIB vaccination had an OR of 5.9 (CI 1.4–24.4) ($p = 0.01$) for the induction of IA-2A and of 3.4 (CI 1.1–10.8) ($p = 0.04$) for GADA. Furthermore, the titers of IA-2A were significantly higher ($p < 0.01$ in Mann-Whitney test) in those children who had got HIB vaccination. No other vaccination was related to the prevalence of autoantibodies at the age of 1 year.

## DISCUSSION

Autoantibodies to GAD and IA-2 are used as markers for a β cell autoimmune process, which later might lead to T1D. The emergence of autoantibodies is a dynamic process[16] and, so far, there is no consensus as to what age and how often children in the general population should be tested to achieve the best possible prediction value for the clinical T1D. The cutoff for positivity is usually calculated according to the autoantibody level exceeding the 97th to 99th percentile in a normal population. The higher cutoff for positivity improves the specificity of the autoantibody test in population screening. However, one can speculate that children with the highest levels of β cell autoantibodies have already developed a fully maturated immune response against β cell antigens. To study the primary environmental triggers of β cell autoimmunity, lower cutoff levels for positivity may reveal environmental factors that induce the production of β cell autoantibodies. We have therefore based our calculations on two types of cutoff values: the levels above 99th percentile for identifying children at risk of T1D and the levels above 90th percentile to identify children in whom production of autoantibodies has been triggered. Furthermore, it is possible that environmental factors have a more pronounced role in the induction of an abnormal immune response in children without high genetic risk and, thus, we have included the general child population in an area with high incidence of T1D. Vaccinations have been studied as candidate environmental risk factors for T1D mellitus and most studies have found no increased risk of T1D mellitus associated with vaccination.[7–13] Studies of the association of β cell autoimmunity and vaccinations are few and the number of children who have not received the vaccination has been limited in several studies.

BCG vaccine has been suggested to have a protective or delaying effect on T1D in retrospective studies.[17] In animal models, the development of autoimmune diabetes can be prevented by a single injection of BCG vaccine or complete Freund's adjuvant in animal models.[14,18–20] BCG vaccine contains mycobacterium antigens, including heat shock protein 65, an antigen suggested to be autoantigen in T1D mellitus and having a protective immunization effect in the NOD mouse model.[21–23] Interestingly, we found increased risk for development of high levels of IA-2A in relation to BCG vaccination. However, the number of children who received BCG vaccination was relatively small in our study and these children represent a special group of children since BCG vaccination is not included in the general vaccination program in Sweden. It is, however, noteworthy that BCG vaccination is given in all children born in Finland with the highest incidence of T1D mellitus in the world. Although Parent *et al.* did not find any differences in overall BCG vaccination rates between cases with T1D and their matched control subjects, they found a much lower proportion of cases who developed T1D by the age of 5 years among children who were BCG-vaccinated than in children who were not vaccinated. Our results as well as the findings by Parent *et al.* suggest that BCG vaccination at birth may increase the risk of β cell autoimmunity and T1D during the first years of life, but does not have a long-lasting effect. Accordingly, the effect of BCG vaccination on the incidence of T1D diagnosed at early age should be evaluated.

In a 10-year follow-up of more than 100,000 Finnish children who participated in a trial of HIB vaccination, no evidence of increased risk for T1D could be found.[24] Others have also been unable to find any association between HIB vaccination and diabetes.[11,25] Our finding indicates that HIB vaccination stimulates the immune system. Such an unspecific stimulation may have a polyclonal effect and thereby increase the production of GADA and IA-2A. We do not dare to draw any conclusion as to risk of getting manifest T1D. However, HIB vaccination might be of importance under special circumstances when the β cell–related immune response is activated by other mechanisms. Our further follow-up of these children will show whether this early stimulation of the immune system, and of production of GADA and IA-2A, has any link to the risk of T1D.

## ACKNOWLEDGMENTS

We are very thankful to all children and their parents participating in ABIS, as well as to the health centers where all questionnaires are collected and biological samples taken. We are grateful to Sonja Hellström, Lena Berglert, and Gosia Smolinska, who have been of great help in the autoantibody determinations. This study, as a part of the ABIS project, was generously supported by the JDRF-Wallenberg Foundations (K98-99D-12813-01A), the Swedish Medical Research Council (MFR; Vetenskapsrådet) (K99-72X-11242-05A), the Swedish Child Diabetes Foundation (Barndiabetes-fonden), the Swedish Diabetes Association, and the Novo Nordisk Foundation.

## REFERENCES

1. KARVONEN, M. *et al.* 2000. Incidence of childhood type 1 diabetes worldwide: Diabetes Mondiale (DiaMond) Project Group. Diabetes Care **23:** 1516–1526.

2. PUNDZIUTE-LYCKA, A. *et al.* 2002. Type I diabetes in the 0–34 years group in Sweden. Diabetologia **45:** 783–791.
3. BINGLEY, P.J. *et al.* 1997. Prediction of IDDM in the general population: strategies based on combinations of autoantibody markers. Diabetes **46:** 1701–1710.
4. SAMUELSSON, U. *et al.* 2001. Islet autoantibodies in the prediction of diabetes in school children. Diabetes Res. Clin. Pract. **51:** 51–57.
5. LINDBERG, B. *et al.* 1999. Previous exposure to measles, mumps, and rubella—but not vaccination during adolescence—correlates to the prevalence of pancreatic and thyroid autoantibodies. Pediatrics **104:** E12.
6. LUDVIGSSON, J. *et al.* 1988. Mumps with laboratory signs of subclinical pancreatitis may cause a disturbed beta-cell function. Diabetes Res. **9:** 193–195.
7. BLOM, L., L. NYSTROM & G. DAHLQUIST. 1991. The Swedish Childhood Diabetes Study: vaccinations and infections as risk determinants for diabetes in childhood. Diabetologia **34:** 176–181.
8. HYOTY, H. *et al.* 1993. Decline of mumps antibodies in type 1 (insulin-dependent) diabetic children and a plateau in the rising incidence of type 1 diabetes after introduction of the mumps-measles-rubella vaccine in Finland: Childhood Diabetes in Finland Study Group. Diabetologia **36:** 1303–1308.
9. DAHLQUIST, G. & L. GOTHEFORS. 1995. The cumulative incidence of childhood diabetes mellitus in Sweden unaffected by BCG-vaccination. Diabetologia **38:** 873–874.
10. HEIJBEL, H., R.T. CHEN & G. DAHLQUIST. 1997. Cumulative incidence of childhood-onset IDDM is unaffected by pertussis immunization. Diabetes Care **20:** 173–175.
11. GRAVES, P.M. *et al.* 1999. Lack of association between early childhood immunizations and beta-cell autoimmunity. Diabetes Care **22:** 1694–1697.
12. HUMMEL, M. *et al.* 2000. No major association of breast-feeding, vaccinations, and childhood viral diseases with early islet autoimmunity in the German BABYDIAB Study. Diabetes Care **23:** 969–974.
13. EURODIAB SUBSTUDY 2 STUDY GROUP. 2000. Infections and vaccinations as risk factors for childhood type I (insulin-dependent) diabetes mellitus: a multicentre case-control investigation. Diabetologia **43:** 47–53.
14. CLASSEN, J.B. 1996. The timing of immunization affects the development of diabetes in rodents. Autoimmunity **24:** 137–145.
15. WAHLBERG, J. *et al.* 2003. Environmental factors related to the induction of beta-cell autoantibodies in 1-year old healthy children. Submitted.
16. KNIP, M. 1997. Disease-associated autoimmunity and prevention of insulin-dependent diabetes mellitus. Ann. Med. **29:** 447–451.
17. PARENT, M.E. *et al.* 1997. Bacille Calmette-Guérin vaccination and incidence of IDDM in Montreal, Canada. Diabetes Care **20:** 767–772.
18. HARADA, M., Y. KISHIMOTO & S. MAKINO. 1990. Prevention of overt diabetes and insulitis in NOD mice by a single BCG vaccination. Diabetes Res. Clin. Pract. **8:** 85–89.
19. SADELAIN, M.W. *et al.* 1990. Prevention of type I diabetes in NOD mice by adjuvant immunotherapy. Diabetes **39:** 583–589.
20. SHEHADEH, N. *et al.* 1994. Effect of adjuvant therapy on development of diabetes in mouse and man. Lancet **343:** 706–707.
21. ELIAS, D. *et al.* 1991. Vaccination against autoimmune mouse diabetes with a T-cell epitope of the human 65-kDa heat shock protein. Proc. Natl. Acad. Sci. USA **88:** 3088–3091.
22. BRAS, A. & A.P. AGUAS. 1996. Diabetes-prone NOD mice are resistant to *Mycobacterium avium* and the infection prevents autoimmune disease. Immunology **89:** 20–25.
23. RAZ, I. *et al.* 2001. Beta-cell function in new-onset type 1 diabetes and immunomodulation with a heat-shock protein peptide (DiaPep277): a randomised, double-blind, phase II trial. Lancet **358:** 1749–1753.
24. KARVONEN, M., Z. CEPAITIS & J. TUOMILEHTO. 1999. Association between type 1 diabetes and haemophilus influenzae type b vaccination: birth cohort study. BMJ **318:** 1169–1172.
25. DESTEFANO, F. *et al.* 2001. Childhood vaccinations, vaccination timing, and risk of type 1 diabetes mellitus. Pediatrics **108:** E112.

# EXHIBIT  F



**ELSEVIER**

# Adverse Events Associated with Hepatitis B Vaccine in U.S. Children Less Than Six Years of Age, 1993 and 1994

MONICA A. FISHER, MPH, PhD, STEPHEN A. EKLUND, DrPH, MHSA,
SHERMAN A. JAMES, PhD, AND XIHONG LIN, PhD

**PURPOSE:** This study evaluated infrequent adverse reactions to hepatitis B vaccine by investigating the association of this vaccine with adverse health outcomes for U.S. children less than six years of age. The evaluation of the association between hepatitis B vaccine and chronic arthritis provides needed data, relevant to the Institute of Medicine's Report that there are inadequate data available to assess the causal relationship of hepatitis B vaccine to arthritis risk.

**METHODS:** The 1993 (n = 5505 children) and 1994 (n = 6515 children) National Health Interview Survey (NHIS) datasets were analyzed to provide post-marketing surveillance data from probability samples of the U.S. population. Incident cases of adverse events were determined from the temporal association between the hepatitis B vaccination and the adverse events. Logistic regression modeling was used to adjust for potential confounding.

**RESULTS:** Controlling for age, race, and gender simultaneously in the 1994 NHIS, hepatitis B vaccine was found to be associated with prevalent arthritis [odds ratio (OR) = 5.91, 95% confidence interval (CI) = 1.05–33.14], incident acute ear infections (OR = 1.60, 95% CI = 1.00–2.58), and incident pharyngitis/nasopharyngitis (OR = 1.41, 95% CI = 0.95–2.09).

**CONCLUSIONS:** Evidence from this study suggests that hepatitis B vaccine is positively associated with adverse health outcomes in the general population of US children.
*Ann Epidemiol 2001;11:13–21.* © 2000 Elsevier Science Inc. All rights reserved.

KEY WORDS: Adverse Effects, Child, Hepatitis B, Hepatitis B Vaccine, Infant, Risk, Risk Assessment.

## INTRODUCTION

Hepatitis B (HB) is not generally considered to be a child-hood disease in the U.S. (1). There were a total of 10,176 cases of HB reported to CDC in 1996, with 78 (0.77%) of them among children < 5 years old (2). Adverse reactions have been reported for the five-day period following each dose during field trials. Short-term, relatively common complications of HB vaccine are often encountered in clinical trials. Table 1 depicts some of the published serious adverse reactions following recombinant HB vaccination (3–49). Additionally, the Institute of Medicine (IOM) (50) reported that the evidence established a causal relation, along with demonstrated biologic plausibility, for the association of

HB vaccine and anaphylaxis. In fact, in the committee's judgment, the HB vaccine could cause fatal anaphylaxis. However, when the IOM (50) evaluated long-term outcomes such as arthritis, Guillain-Barré syndrome, and other demyelinating diseases (optic neuritis, multiple sclerosis, or transverse myelitis), the conclusion was that the evidence was inadequate to accept or reject a causal relation with HB vaccine.

The purpose of this study was to evaluate HB vaccination and associated adverse health outcomes, as reported by a representative sample of the U.S. population of children under 6 years of age. This study addresses the lack of long-term follow-up after HB vaccination, and the unknown external validity of results from high risk populations in clinical trials. This epidemiologic approach also addresses the issue of rare adverse reactions (included in IOM report or a minimum of 20 incident cases) which are not found in clinical trials.

From the Department of Community Medicine (M.A.F.), School of Medicine, West Virginia University, Morgantown, WV; Department of Epidemiology (S.A.E., S.A.J.), Department of Health Behavior and Health Education (S.A.J.), and Department of Biostatistics (X.L.), School of Public Health, University of Michigan, Ann Arbor, MI.

Address reprint requests to: Dr. M.A. Fisher, c/o Dr. Eklund, University of Michigan School of Public Health, Department of Epidemiology, 109 S. Observatory Street, Ann Arbor, MI 48109–2029.

Work done while M.A.F. was a doctoral student in the Department of Epidemiology, School of Public Health, University of Michigan, Ann Arbor, MI.

Received December 22, 1997; accepted June 4, 2000.

## MATERIALS AND METHODS

### Study Population

Data were taken from the 1993 and 1994 NHIS. The NHIS is a probability sample of the civilian noninstitutionalized

© 2000 Elsevier Science Inc. All rights reserved.
655 Avenue of the Americas, New York, NY 10010

1047-2797/01/$–see front matter
PII S1047-2797(00)00078-8

14   Fisher et al.
HEPATITIS B VACCINE AND ADVERSE EVENTS

AEP Vol. 11, No. 1
January 2001: 13–21

---

### Selected Abbreviations and Acronyms

CDC = Centers for Disease Control and Prevention
HB = hepatitis B
IOM = Institute of Medicine
NHIS = National Health Interview Survey
SUDAAN = survey data analysis

---

population residing in the U.S. The total interview sample for 1994 for the basic health questionnaire consisted of 45,705 households and 116,179 individuals. The 1994 nonresponse was 5.9%. The total interview sample for 1993 for the basic health questionnaire consisted of 43,007 households and 109,671 individuals. The 1993 nonresponse was 4.4%.

All information is obtained from household members with responsibility for the child included in this study. The HB vaccination history is documented for those children with vaccination records available. The 1994 NHIS Immunization Supplement dataset consisted of 8087 children 0–5 years of age, whereas the one for 1993 consisted of 7323 children 0–5 years of age. Initially, the association between HB vaccination status and health outcomes/medical conditions was evaluated in the 1994 NHIS dataset. Then, an independent test of the associations found in the 1994 NHIS was made using a second, separate, and distinct dataset representative of U.S. children (1993 NHIS).

### Description of Exposure Variable

Hepatitis B vaccination status was defined in terms of the source of data, either an available vaccination record (62.7%) or parent self-report (37.3%) (Table 2). Children were considered to be non-HB vaccinated if their vaccination record was available and HB vaccine was not listed; or for those without a vaccination record, when it was reported by the responsible adult that their child did not receive the HB vaccine. Children were considered HB vaccinated when their vaccination record listed HB vaccine; or for those without a vaccination record, when the responsible adult reported that their child received the HB vaccine.

The proportion of children's HB vaccination status that was self-reported ranged from 48.6% of black children, 35.5% of white children, and 31.1% of "other" race children (Table 2). Children with unknown HB vaccination status were excluded (1572 in 1994 and 1818 in 1993) when the responsible adult did not know whether or not their child received HB vaccine, resulting in 6515 children included in the analysis of the 1994 NHIS and 5505 children in the separate analysis of the 1993 NHIS.

### Description of Outcome Variables

This study evaluated separately the association between HB vaccine and chronic arthritis, acute ear infection, and pharyngitis/nasopharyngitis. The temporal association between HB vaccine and acute ear infection and pharyngitis/nasopharyngitis was evaluated using the date of HB vaccine dose

---

**TABLE 1.** Published potential serious adverse reactions subsequent to recombinant hepatitis B vaccine

| Potential adverse reaction | Literature citation |
|---|---|
| **Skin and musculoskeletal conditions** | |
| Arthritis | Aherne and Collins (3), Biasi et al. (4), Gross et al. (5), Hasson and Oldham (6), Phanuphak et al. (7), Rogerson and Nye (8), Stratton et al. (9), Vautier and Carty (10), Wieland and Cohen (11) |
| Psoriasis | Morris et al. (12) |
| Other collagen conditions | Rogerson and Nye (8), Allen et al. (13), Aubin et al. (14), DiLernia et al. (15), Goolsby (16), Mamoux and Dumont (17), Martinez and Domingo (18), McMahon et al. (19), Nadler (20), Trevisan and Stinco (21), Tudela et al. (22), WHO (23) |
| **Impairments** | |
| Visual impairment | WHO (23), AADRAC (24), Brezin et al. (25), Brezin et al. (26), Devin et al. (27), Fried et al. (28) |
| Paralysis or muscles affected | Deisenhammer et al. (29), Ganry et al. (30) |
| **Digestive conditions** | |
| Flu-like symptoms | McMahon et al. (19) |
| Liver dysfunction | Lilic and Ghosh (31) |
| Blood and blood-forming systems | Phanuphak et al. (7), Wieland and Cohen (11), Martinez and Domingo (18), McMahon et al. (19), Brezin et al. (26), Lilic and Ghosh (31), CDWR (32), Germanaud et al. (33), Hammond et al. (34), Meyboom et al. (35), Nagafuchi et al. (36), Pharm Newsl (37), Poullin and Gabriel (38) |
| **Nervous system conditions** | |
| Convulsions and seizures | Vadheim et al. (39), WHO (23) |
| Neuralgia or neuritis | AADRAC (24), Herroelen et al. (40), Kaplanski et al. (41), Mahassin et al. (42), CDC (43), Tartaglino et al. (44), Trevisani et al. (45), WHO (23) |
| Kidney conditions | Carmeli and Oren (46), 1993; Macario et al. (47) |
| Acute pericarditis | Bensaid and Denis (48) |
| Respiratory conditions | Phanuphak et al. (7), Stratton et al. (9), Wieland and Cohen (11), Allen et al. (13), Hammond et al. (34), Dobson et al. (49) |

AEP Vol. 11, No. 1
January 2001: 13–21

Fisher et al.    **15**
HEPATITIS B VACCINE AND ADVERSE EVENTS

**TABLE 2.** Proportion of children reported as hepatitis B vaccinated among those with and without a vaccination record available, 1994 National Health Interview Survey

| Third variable | No vaccination record available N = 2432 (37.3%) | | Vaccination record available N = 4083 (62.7%) | |
| --- | --- | --- | --- | --- |
| | Vaccinated N = 1713 (70.4%) | Non-vaccinated N = 719 (29.6%) | Vaccinated N = 1589 (38.9%) | Non-vaccinated N = 2494 (61.1%) |
| Race | | | | |
| White | 1288 (75.2%) | 558 (77.6%) | 1282 (80.7%) | 2079 (83.4%) |
| Black | 361 (21.1%) | 136 (18.9%) | 211 (13.3%) | 314 (12.6%) |
| Other | 64 (3.7%) | 25 (3.5%) | 96 (6.0%) | 101 (4.1%) |
| Education of responsible adult | | | | |
| < high school graduate | 174 (10.2%) | 72 (10.0%) | 192 (12.1%) | 342 (13.7%) |
| ≥ high school graduate | 1521 (88.8%) | 645 (89.7%) | 1390 (87.5%) | 2144 (86.0%) |
| Unknown | 18 (1.0%) | 2 (0.3%) | 7 (0.4%) | 8 (0.3%) |
| Family income | | | | |
| < $20,000 | 572 (33.4%) | 208 (28.9%) | 511 (32.2%) | 802 (32.2%) |
| ≥ $20,000 | 1110 (64.8%) | 497 (69.1%) | 1063 (66.9%) | 1659 (66.5%) |
| Unknown | 31 (1.8%) | 14 (2.0%) | 15 (0.9%) | 33 (1.3%) |

Source: National Center for Health Statistics (1994).
N = number of children.

one and the date of onset of the medical conditions. The date of onset was defined as the mid-point date in the onset period. An incident case occurred subsequent to the date of the first dose of HB vaccine. An acute condition was defined as an illness that ordinarily lasts less than three months, was first noticed less than three months before the date of interview, and was serious enough to affect behavior (51). A chronic condition was defined as a current condition that was noticed three months or more before the interview date.

These self-reported medical conditions are coded in the NHIS using a slight modification of the 9th revision of the International Classification of Diseases. The codes are listed in the Public Use Data File Documentation, Part III of the Medical Coding Manual and Short Index, 1994 NHIS (52).

**Statistical Analysis**

It was hypothesized that an equivalent proportion of HB vaccinated and non-HB vaccinated respondents developed the potential adverse reactions. The initial analysis used the 1994 NHIS to investigate the association of HB vaccine with medical conditions, based on the published potential serious adverse reactions subsequent to recombinant HB vaccine (Table 1). The additional follow-up test of a separate and distinct dataset was performed to assess whether the association between HB vaccine and chronic arthritis, pharyngitis/nasopharyngitis, and acute ear infections found in the 1994 dataset was also present in the 1993 NHIS, or if it was a chance occurrence. This approach tested the specificity of the outcome to the HB vaccine, because if the outcome is equally distributed among the vaccinated and non-HB vaccinated groups, then the outcome is not specific for the HB vaccine.

According to the NHIS documentation (51), the complex, multistage probability sample utilized by the NHIS must be reflected in the derivation of survey-based estimates. The NHIS complex survey design and sample weights were taken into account in the data analysis using Survey Data Analysis (SUDAAN) computer software. Persons for whom valid responses were not available for individual items were excluded. This exclusion of unknowns implicitly assumes that the response distribution for the missing values is the same as for the responses that were provided.

Multiple logistic regression was used to control for potential confounding variables. A separate logistic regression model estimated the magnitude of the association between the exposure (HB vaccinated or non-HB vaccinated) and the binary outcome (chronic arthritis, acute ear infections, and pharyngitis/nasopharyngitis). The odds ratio (OR) was used to indicate the strength of the association between potential adverse reaction(s) and exposure to the risk factor (HB vaccination). Because the potential adverse reaction prevalence/incidence is low, the relative risk (RR) is estimated by the OR, adjusted for confounding and for the complex survey design. The independent variables in the logistic regression model are the HB vaccination status and the confounding variables (age, race, gender, highest education of responsible adult, and family income). Either five dummy variables (1, 2, 3, 4, 5; referent is 0) or 2 dummy variables (2–3, 4–5; referent is 0–1) were used for age, depending on the number of cases. Race was self-reported by the responsible adult, and was categorized for analysis as white, black, and other, with white being the referent. Highest education of the responsible adult was defined as a binary variable: less than high school graduate or, at least, high school graduate (referent is less than high school graduate).

16    Fisher et al.
HEPATITIS B VACCINE AND ADVERSE EVENTS

AEP Vol. 11, No. 1
January 2001: 13–21

**TABLE 3.** Descriptive summary of hepatitis B vaccinated and non-hepatitis B vaccinated < 6 years old, 1994 National Health Interview Survey

| Variables | Age < 2 years | | | | 2–5 years | | | |
| | Vaccinated | | Non-HB vaccinated | | Vaccinated | | Non-HB vaccinated | |
| | N = 1536 | % | N = 503 | % | N = 1766 | % | N = 2710 | % |
|---|---|---|---|---|---|---|---|---|
| Gender | | | | | | | | |
|   Females | 776 | 50.52 | 247 | 49.11 | 848 | 48.02 | 1353 | 49.93 |
|   Males | 760 | 49.48 | 256 | 50.89 | 918 | 51.98 | 1357 | 50.07 |
| Age (years) | | | | | | | | |
|   0 | 685 | 44.60 | 171 | 34.00 | 0 | 0.00 | 0 | 0.00 |
|   1 | 851 | 55.40 | 332 | 66.00 | 0 | 0.00 | 0 | 0.00 |
|   2 | 0 | 0.00 | 0 | 0.00 | 654 | 37.03 | 724 | 26.72 |
|   3 | 0 | 0.00 | 0 | 0.00 | 416 | 23.56 | 622 | 22.95 |
|   4 | 0 | 0.00 | 0 | 0.00 | 341 | 19.31 | 679 | 25.05 |
|   5 | 0 | 0.00 | 0 | 0.00 | 355 | 20.10 | 685 | 25.28 |
| Race | | | | | | | | |
|   White | 1220 | 79.43 | 401 | 79.72 | 1350 | 76.44 | 2236 | 82.51 |
|   Black | 231 | 15.04 | 87 | 17.30 | 341 | 19.31 | 363 | 13.39 |
|   Other | 85 | 5.53 | 15 | 2.98 | 75 | 4.25 | 111 | 4.10 |
| Education of responsible adult | | | | | | | | |
|   < high school graduate | 156 | 10.16 | 76 | 15.11 | 210 | 11.89 | 338 | 12.47 |
|   ≥ high school graduate | 1368 | 89.06 | 422 | 83.90 | 1543 | 87.37 | 2367 | 87.34 |
|   Unknown | 12 | 0.78 | 5 | 0.99 | 13 | 0.74 | 5 | 0.19 |
| Family income | | | | | | | | |
|   < $20,000 | 506 | 32.94 | 186 | 36.98 | 577 | 32.67 | 824 | 30.41 |
|   ≥ $20,000 | 1010 | 65.76 | 305 | 60.64 | 1163 | 65.86 | 1851 | 68.30 |
|   Unknown | 20 | 1.30 | 12 | 2.38 | 26 | 1.47 | 35 | 1.29 |

Source: National Center for Health Statistics (1994).
N = Number of children.

Family income was defined as a binary variable: less than $20,000 or, $20,000 or more (referent is less than $20,000).

## RESULTS

When all 6515 children are included in the analysis, 4083 (62.7%) of the children's HB vaccination status is documented on their vaccination record, whereas 2432 (37.3%) of the children's HB vaccination status is from parent self-report. Children with documented HB vaccination status are comparable to the children with parent self-reported HB vaccination status across race, education, and income (Table 2).

Except for age, the HB vaccinated and non-HB vaccinated groups are comparable (Table 3). As age decreases, HB vaccination increases. The age specific proportion of children who are HB-vaccinated is: less than one year olds (80.0%), one year olds (71.9%), two year olds (47.5%), three year olds (40.1%), four year olds (33.4%), and five year olds (34.1%). A statistically significant larger proportion of non-white children were HB vaccinated (56.0%), than white children (49.4%). The odds of HB vaccination for non-white children are 1.30 (1.15–1.47) times higher than for white children.

No gender differences were observed for receipt of the HB vaccine (51.0% for males and 50.4% for females). When looking at the highest education of the responsible adult (Table 3), among HB vaccinated children < 2 years old, a greater proportion of the parents were at least high school graduates than among non-HB vaccinated < 2 year olds. However, among 2–5 year old children, the responsible adult's highest education was comparable for the HB vaccinated and non-HB vaccinated group.

An additional SES indicator is family income. Among HB vaccinated < 2 year olds, a greater proportion had a family income of $20,000 or more, than among non-HB vaccinated < 2 year olds (Table 3). However, among HB vaccinated 2–5 year olds, a smaller proportion had a family income of $20,000 or more, than among non-HB vaccinated 2–5 year olds.

### Chronic Arthritis

The risk of chronic arthritis was 6.20 (1.08–35.46) times greater among those children 0–5 years of age who received the HB vaccine than among those children without HB vaccination (Table 4). In addition to the unadjusted OR, the risk of chronic arthritis was 5.91 (1.05–33.14) times greater among those children who were HB vaccinated than among those children who did not receive the HB vaccine, controlling for age (two dummy variables), race, and gender simultaneously. When education and income were con-

AEP Vol. 11, No. 1
January 2001: 13–21

trolled for, separately, the magnitude of the association did not change. Of the 14 prevalent cases of chronic arthritis in the 1994 NHIS, 12 were among the HB vaccinated and two were among the non-HB vaccinated children.

Because the number of cases is small, it was not appropriate to do incident case assessment, and the results of prevalent case assessment may not be reliable, as shown by the wide confidence interval of the OR. This positive association was evident in the 13 chronic arthritis cases reported in the 1993 NHIS, but the strength of the association was not as strong (Table 4).

### Pharyngitis and Nasopharyngitis

The risk of incident cases of pharyngitis/nasopharyngitis was 1.19 (0.85–1.67) times greater among those children 0–5 years of age who received the HB vaccine than among those children without HB vaccination (Table 5). The risk of incident cases of pharyngitis/ nasopharyngitis was 1.44 (0.97–2.14) times greater among those children who were HB vaccinated than among those children who did not receive the HB vaccine, controlling for age, race, gender, and education in the 1994 NHIS. The results were similar when controlling for age, race, gender, education, and family income. This association was very similar in the 1993 NHIS where the risk of incident cases of pharyngitis/nasopharyngitis was 1.52 (0.97–2.36) times greater among HB vaccinated children than among non-HB vaccinated ones controlling for age, race, gender, and education.

These results should be reliable because of the consistent results for 208 and 139 incident cases of pharyngitis/nasopharyngitis reported in the 1994 NHIS and 1993 NHIS, respectively.

### Acute Ear Infections

The risk of incident cases of acute ear infections was 2.15 (1.34–3.45) times greater among those children 0–5 years of age who received the HB vaccine than among those children without HB vaccination (Table 5). The risk of incident cases of acute ear infections was 1.58 (0.98–2.56) times greater among those children who were HB vaccinated than among those children who did not receive the HB vaccine, controlling for age, race, gender, and education in the 1994 NHIS. The results were similar when controlling for age, race, gender, education, and family income. The risk of incident cases of acute ear infection was 3.02 (1.24–7.34) times greater among those children < 2 years old who received the HB vaccine than among those children < 2 years old who did not receive the vaccine. The association of HB vaccine with acute ear infection was not found in the 1993 NHIS dataset. There were 113 and 86 incident cases of acute ear infections reported in the 1994 NHIS and 1993 NHIS, respectively.

## DISCUSSION

This study of two large datasets representing the general population of U.S. children less than 6 years old found a positive point estimate for the association between HB vaccine and chronic arthritis, acute ear infection, as well as pharyngitis and nasopharyngitis. The study design provides more valid results than the typical cross-sectional survey because the temporal association of disease (adverse reaction) and HB vaccination were computed for pharyngitis/nasopharyngitis and acute ear infection, and because the specific conditions found to be associated with HB vaccine in the 1994 National Health Interview Survey (NHIS) were evaluated for consistency in the 1993 NHIS.

The parent self-report and documented HB vaccination history were comparable across race, education, and income in the 1994 NHIS (Table 2). A greater proportion of children whose HB vaccination status was self-reported were HB vaccinated, than children with documented HB vaccination status. This difference may be explained by a combination of: 1) under-reporting on the household vaccination record if the vaccination record is not current, especially as the child gets older, or if a sibling's vaccination record was mistakenly used; and 2) over-reporting of HB vaccination by parent self-report, because their children were taken in for vaccinations, but the parents may not be aware that the new recommendation for universal infant HB vaccination was made in 1991. Hence, infants born before 1992 (the 2–5 year olds in the 1994 NHIS) were not included in the universal HB vaccination recommendation. This explanation is based on finding that a similar proportion of children < 2 years old were self-reported and documented on their vaccination record as HB vaccinated (Table 6). However, 68.4% of children 2–5 years old whose HB vaccination status was self-reported were HB vaccinated, which is not comparable to the 21.1% of children 2–5 years old whose HB vaccination was documented on their vaccination record (Table 7).

The findings of parent self-report and documented HB vaccination status (Table 2), and further stratified by age < 2 years old (Table 6) and 2–5 years old (Table 7), do not agree completely with Dietz and coworkers' (53) statement that self-reporting of vaccination and outcomes by parent recall in the NHIS data seems reliable. Self-reporting can be considered valid for children < 2 years old, but further assessment is needed for 2–5 year olds.

Nevertheless, we believe that the possibility of this type of measurement error has been minimized in our study because the definition for HB vaccination uses the household vaccination record data when it is available, and uses parent recall when the household vaccination record is not available only for the analysis of chronic arthritis. In that instance, self-report and documented HB vaccination status were used because of the few cases of arthritis. Further support for the validity of the definition of HB vaccination status used in this study is found in the CDC (2) report that

18   Fisher et al.
HEPATITIS B VACCINE AND ADVERSE EVENTS

AEP Vol. 11, No. 1
January 2001: 13–21

**TABLE 4.** Association of hepatitis B vaccine with chronic arthritis for children < 6 years old with and without vaccination records, 1993 and 1994 NHIS

| | 1993 NHIS (N = 5505, n = 13) | 1994 NHIS (N = 6515, n = 14) |
|---|---|---|
| | OR (95% CI) | OR (95% CI) |
| Unadjusted | 1.37 (0.39–4.85) | 6.20 (1.08–35.46) |
| Age (2 dummy), race, gender | 1.53 (0.38–6.13) | 5.91 (1.05–33.14) |
| Age (5 dummy), race, gender | 1.57 (0.41–6.07) | 5.77 (0.99–33.64) |
| Age (5 dummy), race, gender, education | 1.54 (0.39–6.14) | 5.80 (0.99–33.80) |
| Age (5 dummy), race, gender, education, income | 1.60 (0.40–6.39) | 5.79 (0.98–34.12) |

Source: National Center for Health Statistics (1993 and 1994).
N = total number of children, n = number of prevalent cases.

when the National Immunization Survey vaccine data were adjusted after obtaining data from providers' records, the national coverage estimates did not change substantially.

Among HB vaccinated children < 2 years old, a greater proportion had a family income of $20,000 or more, than among non-HB vaccinated children < 2 years old (Table 3). On the other hand, among HB vaccinated children 2–5 years old, a smaller proportion had a family income of $20,000 or more than among non-HB vaccinated 2–5 year olds. This pattern is likely because the universal infant HB vaccination recommendation was made on November 22, 1991 (43), so the HB vaccinated 2–5 year olds would be those at high risk, with a smaller proportion from families with income of $20,000 or more than the non-HB vaccinated 2–5 year olds. The HB vaccinated children < 2 years old would include more of the general population of negligible risk children from families with income of $20,000 or more than non-HB vaccinated children < 2 years old.

Several limitations of this study should be acknowledged. First, medical conditions were not verified through independent sources. However, differential ascertainment of cases in HB vaccinated and non-HB vaccinated children is not likely because there have not been publicized reports of adverse events following HB vaccination. The proportion of children with the medical condition may be underestimated because not all children would be examined clinically to detect the potential adverse health outcomes. Therefore, diagnoses may be missed and not reported during the survey. Second, it is also realized that only morbidity data are available in survey data, so only data for children who survived are available. There are no data in NHIS for children who died; hence it is not possible to evaluate the IOM's inclusion of sudden infant death syndrome as an adverse event which does not have sufficient data available to assess a causal relationship with HB vaccine. Third, there may be differential vaccination rates of individuals at higher or lower risk. In fact, one would expect a greater proportion of the negligible risk infants to be non-HB vaccinated than the high risk infants, because the universal infant HB vaccination recommendation has only recently been implemented, whereas high risk infants have been recommended to receive the HB vaccine since the HB vaccine has been available

**TABLE 5.** Association of hepatitis B vaccine with incident cases of potential adverse reactions for children < 6 years old with vaccination records, 1993 and 1994 NHIS

| | 1993 NHIS | 1994 NHIS |
|---|---|---|
| Potential adverse reaction | OR (95% CI) | OR (95% CI) |
| Incident pharyngitis and nasopharyngitis | (N = 2552, n = 139) | (N = 4077, n = 208) |
| Unadjusted | 1.24 (0.78–1.94) | 1.19 (0.85–1.67) |
| Age (5 dummy), race, gender | 1.48 (0.95–2.29) | 1.41 (0.95–2.09) |
| Age (5 dummy), race, gender, education | 1.52 (0.97–2.36) | 1.44 (0.97–2.14) |
| Age (5 dummy), race, gender, education, income | 1.52 (0.97–2.37) | 1.40 (0.93–2.09) |
| Incident acute ear infection | (N = 2555, n = 86) | (N = 4078, n = 113) |
| Unadjusted | 0.91 (0.52–1.60) | 2.15 (1.34–3.45) |
| Age (5 dummy), race, gender | 0.61 (0.31–1.20) | 1.60 (1.00–2.58) |
| Age (5 dummy), race, gender, education | 0.59 (0.30–1.18) | 1.58 (0.98–2.56) |
| Age (5 dummy), race, gender, education, income | 0.63 (0.32–1.24) | 1.58 (0.97–2.57) |
| Unadjusted age specific (Age < 2 yrs; n = 55) | 0.64 (0.31–1.32) | 3.02 (1.24–7.34) |

Source: National Center for Health Statistics (1993 and 1994).
N = total number of children.
N = number of incident cases.

AEP Vol. 11, No. 1
January 2001: 13–21

**TABLE 6.** Proportion of children < 2 years old reported as hepatitis B vaccinated among those with and without a vaccination record available, 1994 National Health Interview Survey

| Third variable | No vaccination record available n = 693 (34.0%) | | Vaccination record available n = 1346 (66.0%) | |
|---|---|---|---|---|
| | Vaccinated n = 524 (75.6%) | Non-vaccinated n = 169 (24.4%) | Vaccinated n = 1012 (75.2%) | Non-vaccinated n = 334 (24.8%) |
| Race | | | | |
| White | 403 (76.9%) | 124 (73.4%) | 817 (80.7%) | 277 (82.9%) |
| Black | 104 (19.9%) | 42 (24.8%) | 127 (12.6%) | 45 (13.5%) |
| Other | 17 (3.2%) | 3 (1.8%) | 68 (6.7%) | 12 (3.6%) |
| Education of responsible adult | | | | |
| < high school graduate | 49 (9.4%) | 23 (13.6%) | 107 (10.6%) | 53 (15.9%) |
| ≥ high school graduate | 467 (89.1%) | 144 (85.2%) | 901 (89.0%) | 278 (83.2%) |
| Unknown | 8 (1.5%) | 2 (1.2%) | 4 (0.4%) | 3 (0.9%) |
| Family income | | | | |
| < $20,000 | 173 (33.0%) | 61 (36.1%) | 333 (32.9%) | 125 (37.4%) |
| ≥ $20,000 | 343 (65.5%) | 104 (61.5%) | 667 (65.9%) | 201 (60.2%) |
| Unknown | 8 (1.5%) | 4 (2.4%) | 12 (1.2%) | 8 (2.4%) |

Source: National Center for Health Statistics (1994).

in 1982. Fourth, there is also a potential response bias of the respondents vs. the nonrespondents. However, the 1993 NHIS response rate of 95.6% and 1994 NHIS response rate of 94.1% is quite acceptable. Finally, because U.S. children are generally healthy, there is a problem when interpreting negative study results. The findings of no statistically significant association of the HB vaccine with the potential adverse event may be due to our study's limited power.

The strengths, which include large sample size, availability, low cost of the NHIS data, and the accessibility of additional independent datasets, such as the 1993 NHIS, for consistency analysis, appear to outweigh the limitations. The NHIS datasets provide an additional approach to surveillance. Because the NHIS is a probability sample of US

population, it is representative for relevant policy decisions. A considerable strength of this epidemiologic approach is the assessment of incident cases of acute ear infections and pharyngitis/nasopharyngitis, which is a preferred and stronger study design than is the assessment of prevalent cases of arthritis.

The 1994 NHIS public use national database was used to estimate the relative risk of potential rare adverse reactions associated with the HB vaccine. This method analyzes a large representative cohort of U.S. children < 6 years old. The 1994 NHIS dataset was ideal for this evaluation because the proportion of the children who were exposed (HB vaccinated) and nonexposed (non-HB vaccinated) was very close to 50% in each group (50.7% vaccinated and 49.3% non-HB

**TABLE 7.** Proportion of children 2–5 years old reported as hepatitis B vaccinated among those with and without a vaccination record available, 1994 National Health Interview Survey

| Third variable | No vaccination record available n = 1739 (38.9%) | | Vaccination record available n = 2737 (61.1%) | |
|---|---|---|---|---|
| | Vaccinated n = 1189 (68.4%) | Non-vaccinated n = 550 (31.6%) | Vaccinated n = 577 (21.1%) | Non-vaccinated n = 2160 (78.9%) |
| Race | | | | |
| White | 885 (74.4%) | 434 (78.9%) | 465 (80.6%) | 1802 (83.4%) |
| Black | 257 (21.6%) | 94 (17.1%) | 84 (14.6%) | 269 (12.5%) |
| Other | 47 (4.0%) | 22 (4.0%) | 28 (4.8%) | 89 (4.1%) |
| Education of responsible adult | | | | |
| < high school graduate | 125 (10.5%) | 49 (8.9%) | 85 (14.7%) | 289 (13.4%) |
| ≥ high school graduate | 1054 (88.7%) | 501 (91.1%) | 489 (84.8%) | 1866 (86.4%) |
| Unknown | 10 (0.8%) | 0 (0.0%) | 3 (0.5%) | 5 (0.2%) |
| Family income | | | | |
| < $20,000 | 399 (33.6%) | 147 (26.7%) | 178 (30.9%) | 677 (31.3%) |
| ≥ $20,000 | 767 (64.5%) | 393 (71.5%) | 396 (68.6%) | 1458 (67.5%) |
| Unknown | 23 (1.9%) | 10 (1.8%) | 3 (0.5%) | 25 (1.2%) |

Source: National Center for Health Statistics (1994).

20   Fisher et al.
HEPATITIS B VACCINE AND ADVERSE EVENTS

AEP Vol. 11, No. 1
January 2001: 13–21

vaccinated) which maximizes the statistical power. There is no selection bias because the respondents are a probability sample of the civilian noninstitutionalized population residing in the U.S.

In the 1994 NHIS, the potential adverse reactions associated with HB vaccine included chronic arthritis, acute ear infection, pharyngitis, and nasopharyngitis. The strength of association for HB vaccine and chronic arthritis provide evidence in the direction of causality that is relevant to the IOM (1994) concern that there is inadequate evidence to reach a conclusion of causality. The IOM (1994) reported that the biological plausibility for an association of arthritis and HB vaccine is derived from the knowledge that experimental acute serum sickness is accompanied by arthritis and that HB infection is associated with arthropathies and a serum sickness-like syndrome. The weaker association of HB vaccine with chronic arthritis in the 1993 NHIS may be due to the chronic nature of the condition, and its latency period, the more appropriate analysis will be with future NHIS datasets which will have increasing HB vaccination coverage of older children (as the previous year's one-year-olds become the next year's two-year-olds, etc). Thus, analysis of the association of HB vaccine with chronic arthritis in the 1995 NHIS will provide some insight into the lack of consistency found between the 1993 NHIS and 1994 NHIS datasets.

The association of pharyngitis and nasopharyngitis with HB vaccine is consistent in both the 1993 and 1994 NHIS. The 1994 and 1993 NHIS datasets had similar point estimates and confidence intervals for the measure of association for HB vaccine and incident cases, controlling for potential confounders. This consistency supports the hypothesis that pharyngitis/nasopharyngitis is an adverse reaction to the HB vaccine. A hypothetical explanation for the biological plausibility for the association of pharyngitis and nasopharyngitis is that the HB vaccine affects the immune system, which may make the vaccinated children more susceptible to infectious agents, or exaggerate the inflammatory response, resulting in a greater proportion of HB vaccinated children developing pharyngitis or nasopharyngitis than non-HB vaccinated children.

The association of acute ear infections with the HB vaccine seems to be more complex. There is an association of age with both the HB vaccine and development of acute ear infections. One explanation for the greater strength of the association of HB vaccine with acute ear infections for the < 2 year olds is that these youngest children are more susceptible to ear infections because of the development of the ear canal, and a greater proportion are HB vaccinated than the older children. The association of HB vaccine and acute ear infections may not have been evident in the 1993 NHIS because of the smaller number of incident cases of acute ear infections and the smaller proportion of children receiving the HB vaccine (incident cases = 86 and 41.0% HB vaccinated).

The IOM (50) report concluded that there is insufficient data available to accept or reject a causal relation between HB vaccine and Guillain-Barré syndrome, other demyelinating disease (optic neuritis, multiple sclerosis, or transverse myelitis), arthritis, and sudden infant death syndrome. The IOM (50) report also concluded that the data established a causal relation for the association of HB vaccine with anaphylaxis. Other investigators stated that, in the U.S., the HB vaccine is recommended for use only by those at high risk of exposure to HB virus (54) and that the risk of HB infection for most infants is negligible, therefore, routine HB vaccination of U.S. infants is not indicated (55). Under these circumstances, the HB vaccination policy remains an open question because more infants are subject to vaccination than to the disease and the infants who suffer from the preventive measure may not be the ones who would have suffered from the disease (56). The Universal Infant HB vaccination recommendation should continue to be evaluated for the general population of US infants regarding the longer term risks and benefits associated with the vaccine.

This study was supported in part by the Blue Cross Blue Shield of Michigan Student Award Program and by a research supplement to NIH grant 5 R01-DE10616–01.

## REFERENCES

1. Margolis HS. Prevention of acute and chronic liver disease through immunization: hepatitis B and beyond. J Infect Dis. 1993;168:9–14.
2. CDC. Centers for Disease Control and Prevention. Quarterly immunization table. MMWR. 1997;46(4):88.
3. Aherne P, Collins M. Psoriatic arthropathy. Ir Med J. 1995;88:72.
4. Biasi D, Carletto A, Caramaschi P, Frigo A, Pacor ML, Bezzi D, et al. Rheumatological manifestations following hepatitis B vaccination. A report of 2 clinical cases. Recenti Prog Med. 1994; 85:438–440.
5. Gross K, Combe C, Kruger K, Schattenkirchner M. Arthritis after hepatitis B vaccination. Report of three cases. Scand J Rheumatol. 1995;24:50–52.
6. Hassan W, Oldham R. Reiter's syndrome and reactive arthritis in health care workers after vaccination. BMJ. 1994;309:94.
7. Phanuphak P, Phanpanich T, Woguria, Sirivichayakul S, Sriwanthana B, Panmuong W, et al. Comparative immunogenicity study of four plasma-derived hepatitis B vaccine in Thai young adults. Vaccine. 1989;7:253–256.
8. Rogerson SJ, Nye FJ. Hepatitis B vaccine associated with erythema nodosum and polyarthritis. BMJ. 1990;301:345.
9. Stratton KR, Howe CJ, Johnson RB Jr. Adverse events associated with childhood vaccines other than pertussis and rubella. J Am Med Assoc. 1994;271:1602–1605.
10. Vautier G, Carty JE. Acute sero-positive rheumatoid arthritis occurring after hepatitis vaccination. Br J Rheumatol. 1994;33:991.
11. Wieland KK, Cohen MR. Hepatitis B vaccine: Recombivax reaction. Nursing. 88;18:87.
12. Morris CA, Oliver RR, Reynolds F, Selkan JB. Intradermal hepatitis B immunisation with yeast-derived vaccine: Serological response by sex and age. Epidemiol Infect. 1989;103:387–394.
13. Allen MB, Cockwell P, Page RL. Pulmonary and cutaneous vasculitis following hepatitis B vaccination. Thorax. 1993;48:580–581.

14. Aubin F, Angonin R, Humbert P, Agache P. Lichen planus following hepatitis B vaccination. Arch Dermatol. 1994;130:1329–1330.

15. DiLernia V, LoScocco G, Bisighini G. Erythema multiforme following hepatitis B vaccine. Pediatr Dermatol. 1994;11:363–364.

16. Goolsby PL. Erythema nodosum after Recombivax HB hepatitis B vaccine. New Eng J Med. 1989;321:1198–1199.

17. Mamoux V, Dumont C. Lupus erythematosus disseminatus and vaccination against hepatitis B virus. Arch Pediatr. 1994;1:307–308.

18. Martinez E, Domingo P. Evan's syndrome triggered by recombinant hepatitis B vaccine. Clin Infect Dis. 1992;15:1051.

19. McMahon BJ, Helminiak BJ, Wainright RB, Bulkow L, Trimble BA, Wainright K. Frequency of adverse reactions to hepatitis B vaccine in 43618 persons. Am J Med. 1992;92:254–256.

20. Nadler JP. Multiple sclerosis and hepatitis B vaccination. Clin Infect Dis. 1993;17:928–929.

21. Trevisan G, Stinco G. Lichen ruber planus following HBV vaccination. Acta Derm Venereol. 1993;73:73.

22. Tudela P, Marti S, Bonal J. Systemic lupus erythematosus and vaccination against hepatitis B. Nephron. 1992;62:236.

23. WHO. Hepatitis B vaccines: Reported reactions. WHO Drug Inf. 1990;4:129.

24. AADRAC. Australian Adverse Drug Reactions Advisory Committee: Reactions to hepatitis B vaccines. Austr Adv Drug React Bull; 1990.

25. Brezin AP, Massin-Korobelnik P, Boudin M, Gaudric A, LeHoang P. Acute posterior multifocal placoid pigment epitheliopath after hepatitis B vaccine. Arch Ophthalmol. 1995;113:297–300.

26. Brezin AP, Lautier-Frau M, Hamedani M, Rogeaux O, Hoang PL. Visual loss and eosinophilia after recombinant hepatitis B vaccine. Lancet. 1993;342:563–564.

27. Devin F, Roques G, Disdier P, Rodor F, Weiller PJ. Occlusion of central retinal vein after hepatitis B vaccination. Lancet. 1996; 347:1626.

28. Fried M, Conen D, Conzelmann M, Steinemann E. Uveitis after hepatitis B vaccination. Lancet. 1987;ii:631–632.

29. Deisenhammer F, Pohl P, Bosch S, Schmidauer C. Acute cerebellar ataxia after immunisation with recombinant hepatitis B vaccine. Acta Neurol Scand. 1994;89:462–463.

30. Ganry O, Lerailler F, Vercelletto M, Chiffoleau A, Larousse C. Peripheral facial paralysis following vaccination against hepatitis B. Apropos of a case. Therapie. 1992;47:437–438.

31. Lilic D, Ghosh SK. Liver dysfunction and DNA antibodies after hepatitis B vaccination. Lancet. 1994;344:1292–1293.

32. CDWR. Alleged link between hepatitis B vaccine and chronic fatigue syndrome. Can Dis Wkly Rep. 1991;17:215–216.

33. Germanaud J, Causse X, Trinh DH, Pfau-Fandard B, Trepo C. A case of severe cytolysis after hepatitis B vaccination. Am J Med. 1995; 98:595–596.

34. Hammond GW, Parker J, Mimms L, Tate R, Sekla L, Minuk G. Comparison of immunogenicity of two yeast-derived recombinant hepatitis B vaccines. Vaccine. 1991;9:97–100.

35. Meyboom RH, Fucik H, Edwards IR. Thrombocytopenia reported in association with hepatitis B and A vaccines. Lancet. 1995;345:1638.

36. Nagafuchi S, Tokiyam K, Kashiwagi S, Yayashi S, Imayama S, Niho Y. Eosinophilia after intradermal hepatitis B vaccination. Lancet. 1993; 342:998.

37. Pharm Newsl. Hepatitis-B vaccine: Adverse effects. Pharm Newslett. 1990;9:9.

38. Poullin P, Gabriel B. Thrombocytopenia purpura after recombinant hepatitis B vaccine. Lancet. 1994;344:1293.

39. Vadheim CM, Greenberg DP, Partridge S, Jing J, Ward JI. Effectiveness and safety of an Haemophilus influenzae type b conjugate vaccine (PRP-T) in young infants. Kaiser-UCLA vaccine study group. Pediatrics. 1993;92:272–279.

40. Herroelen L, de Keyser J, Ebinger G. Central-nervous-system demyelenation after immunization with recombinant hepatitis B vaccine. Lancet. 1991;338:1174–1175.

41. Kaplanski G, Retornaz F, Durand J, Soubeyrand J. Central nervous system demyelination after vaccination against hepatitis B and HLA haplotype. J Neurol Neurosurg Psychiatry. 1995;58:758–759.

42. Mahassin F, Algayres JP, Valmary J, Bili H, Courant G, Bequet D, et al. Acute myelitis after vaccination against hepatitis B. Presse Med. 1993;22:1997–1998.

43. Centers for Disease Control and Prevention (CDC). Hepatitis B Virus: A comprehensive strategy for eliminating transmission in the United States through universal childhood vaccination. Recommendations of the immunization Practices Advisory Committee (ACIP). MMWR. 1991;40(RR-l3):1–19.

44. Tartaglino LM, Heiman-Patterson T, Friedman DP, Flanders AE. MR imaging in a case of postvaccination myelitis. Am J Neuroradiol. 1995;16:581–582.

45. Trevisani F, Gattinara GC, Caraceni P, Bernadi M, Albertoni F, D'Alessandro R, et al. Transverse myelitis following hepatitis B vaccination. J Hepatol. 1993;19:317–318.

46. Carmeli Y, Oren R. Hepatitis B vaccine side-effect. Lancet. 1993; 341:250–251.

47. Macario F, Freitas L, Correia J, Campos M, Marques A. Nephrotic syndrome after recombinant hepatitis B vaccine. Clin Nephrol. 1995; 43:349.

48. Bensaid J, Denis F. Benign acute pericarditis after vaccination against hepatitis B. Presse Med. 1993;22:269.

49. Dobson S, Scheifele D, Bell A. Assessment of a universal school-based hepatitis B vaccination program. JAMA. 1995;274:1209–1213.

50. Institute of Medicine (IOM). Hepatitis B vaccine. In: Stratton KR, Howe CJ, Johnston RB Jr, eds. Adverse Events Associated with Childhood Vaccines: Evidence Bearing on Causality. Washington, DC: National Academy Press, 1994:211–235.

51. Adams PF, Marano MA. Current Estimates from the National Health Interview Survey, 1994. Hyattsville, MD. National Center for Health Statistics. Vital Health Statistics; 1995;10(193).

52. USDHHS. Public Use Data Files Documentation. Part III—Medical Coding Manual and Short Index. National Health Interview Survey, 1994. US Department of Health and Human Services. Hyattsville, MD: National Center for Health Statistics; 1995;6–0151.

53. Dietz V, Zell E, Eddins D, Bernier R, Orenstein W. Vaccination coverage in the USA. Lancet. 1994;344:1439–1440.

54. Gerety RJ. Recombinant hepatitis B vaccines. In: Zuckerman AJ, ed. Viral Hepatitis and Liver Disease. New York: Alan R. Liss, Inc; 1988; 1017–1024.

55. Krugman S. Hepatitis B vaccine. In: Plotkin SA, Mortimer EA Jr. Vaccines. Philadelphia: WB Saunders Co; 1988;458–473.

56. Russell L. Is Prevention Better than Cure? Washington DC: The Brookings Institution; 1986.

EXHIBIT  G

# ZITO *tlp*

A Technology Law Practice

26005 RIDGE ROAD, SUITE 203
DAMASCUS, MARYLAND 20872

www.zitotlp.com

Voice (301) 601-5010
Fax   (301) 482-0779

Washington, DC
Damascus, Maryland
Boca Raton, Florida

September 10, 2004

Edward M. Murray, Counsel
Merck & Co., Inc.
One Merck Drive
P.O. Box 100
Whitehouse Station, NJ 0889-0100

           Re:    *Classen v. Biogen et al.*
                   WDQ 04 CV 2607

Dear Mr. Murray,

      Thank you for returning the Waiver of Service form.  As you are aware, we represent Classen Immunotherapies, Inc. in the suit filed in Maryland to enforce several vaccine related patents (United States Patents 6,420,139; 6,638,739; 5,728,385 and 5,723,283).

      Classen Immunotherapies, Inc. is in the business of finding safer ways of administering commercially available pharmaceutical products.   In addition to the patents in suit, my client holds two US Patents 6,219,674 and 6,584,472, and a published patent application, US 2002/0083,080, which cover a business method of screening adverse event information.   Classen Immunotherapies and Merck. have previously discussed licensing these patents for use by Merck.  We are offering to continue those discussions at this time in an effort to allow Merck to pay a royalty for the use of the patents which is substantially less than the damages expected to be recovered by Classen Immunotherapies in the litigation.

      My client would like to meet to discuss a licensing agreement to allow your company to license the vaccine patents, 6,420,139; 6,638,739; 5,728,385 and 5,723,283, and the screening patents, 6,219,674 and  6,584,472, for any or all of Merck's products.  The licensing of these two sets of patents will allow Merck to generate additional revenue more than sufficient to cover the license fees.

      We await your reply.

                                  Sincerely,

                                  Joseph J. Zito

EXHIBIT  H

**MERCK & CO., INC.**
Whitehouse Station, NJ 08889, USA

7994328

# RECOMBIVAX HB®
## HEPATITIS B VACCINE (RECOMBINANT)

**DESCRIPTION**

RECOMBIVAX HB[*] Hepatitis B Vaccine (Recombinant) is a non-infectious subunit viral vaccine derived from hepatitis B surface antigen (HBsAg) produced in yeast cells. A portion of the hepatitis B virus gene, coding for HBsAg, is cloned into yeast, and the vaccine for hepatitis B is produced from cultures of this recombinant yeast strain according to methods developed in the Merck Research Laboratories.

The antigen is harvested and purified from fermentation cultures of a recombinant strain of the yeast *Saccharomyces cerevisiae* containing the gene for the *adw* subtype of HBsAg. The fermentation process involves growth of *Saccharomyces cerevisiae* on a complex fermentation medium which consists of an extract of yeast, soy peptone, dextrose, amino acids and mineral salts. The HBsAg protein is released from the yeast cells by cell disruption and purified by a series of physical and chemical methods. The purified protein is treated in phosphate buffer with formaldehyde and then coprecipitated with alum (potassium aluminum sulfate) to form bulk vaccine adjuvanted with amorphous aluminum hydroxyphosphate sulfate. The vaccine contains no detectable yeast DNA but may contain not more than 1% yeast protein. The vaccine produced by the Merck method has been shown to be comparable to the plasma-derived vaccine in terms of animal potency (mouse, monkey, and chimpanzee) and protective efficacy (chimpanzee and human).

The vaccine against hepatitis B, prepared from recombinant yeast cultures, is free of association with human blood and blood products.

Each lot of hepatitis B vaccine is tested for sterility.

RECOMBIVAX HB is a sterile suspension for intramuscular injection. However, for persons at risk of hemorrhage following intramuscular injection, the vaccine may be administered subcutaneously. (See DOSAGE AND ADMINISTRATION.)

RECOMBIVAX HB Hepatitis B Vaccine (Recombinant) is supplied in three formulations. (See HOW SUPPLIED.)

**Pediatric/Adolescent Formulation (Without Preservative),** 10 mcg/mL: each 0.5 mL dose contains 5 mcg of hepatitis B surface antigen.

**Adult Formulation (Without Preservative),** 10 mcg/mL: each 1 mL dose contains 10 mcg of hepatitis B surface antigen.

**Dialysis Formulation (Without Preservative),** 40 mcg/mL: each 1 mL dose contains 40 mcg of hepatitis B surface antigen.

All formulations contain approximately 0.5 mg of aluminum (provided as amorphous aluminum hydroxyphosphate sulfate, previously referred to as aluminum hydroxide) per mL of vaccine. In each formulation, hepatitis B surface antigen is adsorbed onto approximately 0.5 mg of aluminum (provided as amorphous aluminum hydroxyphosphate sulfate) per mL of vaccine. The vaccine is of the *adw* subtype. RECOMBIVAX HB is indicated for vaccination of persons at risk of infection from hepatitis B virus including all known subtypes. RECOMBIVAX HB Dialysis Formulation is indicated for vaccination of adult predialysis and dialysis patients against infection caused by all known subtypes of hepatitis B virus.

**CLINICAL PHARMACOLOGY**

Hepatitis B virus is one of several hepatitis viruses that cause a systemic infection, with a major pathology in the liver. These include hepatitis A virus, hepatitis D virus, and hepatitis C and E viruses, previously referred to as non-A, non-B hepatitis viruses.

Hepatitis B virus is an important cause of viral hepatitis. There is no specific treatment for this disease. The incubation period for hepatitis B is relatively long; six weeks to six months may elapse between exposure and the onset of clinical symptoms. The prognosis following infection with hepatitis B virus is variable and dependent on at least three factors: (1) Age — Infants and younger children usually experience milder initial disease than older persons;[1] (2) Dose of virus — The higher the dose, the more likely acute icteric hepatitis B will result;[1] and, (3) Severity of associated underlying disease — Underlying malignancy or pre-existing hepatic disease predisposes to increased morbidity and mortality.[1]

Persistence of viral infection (the chronic hepatitis B virus carrier state) occurs in 5-10% of persons following acute hepatitis B, and occurs more frequently after initial anicteric hepatitis B than after initial

[*] Registered trademark of MERCK & CO., Inc.
COPYRIGHT © 1998 MERCK & CO., Inc.
All rights reserved

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                              7994328

icteric disease. Consequently, carriers of hepatitis B surface antigen (HBsAg) frequently give no history of having had recognized acute hepatitis. The Centers for Disease Control and Prevention (CDC) estimates that there are more than 300 million chronic carriers worldwide and 1.25 million chronic carriers of hepatitis B virus in the USA.[29,30] Chronic carriers represent the largest human reservoir of hepatitis B virus.

Serious complications and sequelae of hepatitis B virus infection include massive hepatic necrosis, cirrhosis of the liver, and chronic active hepatitis. More than one million people worldwide die each year of hepatitis B-associated acute and chronic liver disease.[33] In the United States, hepatitis B-virus-related acute and chronic liver disease causes approximately 4-5000 deaths annually.[29,30]

*Reduced Risk of Hepatocellular Carcinoma*

Hepatocellular carcinoma is another serious complication of hepatitis B virus infection. Studies have demonstrated the link between chronic hepatitis B infection and hepatocellular carcinoma; 80% of primary liver cancers are caused by hepatitis B virus infection. The CDC has recognized hepatitis B vaccine as the first anti-cancer vaccine because it can prevent primary liver cancer.[34]

There is also evidence that several diseases other than hepatitis have been associated with hepatitis B virus infection through an immunologic mechanism involving antigen-antibody complexes. Such diseases include a syndrome with rash, urticaria, and arthralgia resembling serum sickness; periarteritis nodosa; membranous glomerulonephritis; and infantile papular acrodermatitis.[3,4]

Although the vehicles for transmission of the virus are often blood and blood products, viral antigen has also been found in tears, saliva, breast milk, urine, semen and vaginal secretions. Hepatitis B virus is capable of surviving at least a month[29] on environmental surfaces exposed to body fluids containing hepatitis B virus. Infection may occur when hepatitis B virus, transmitted by infected body fluids, is implanted via mucous surfaces or percutaneously introduced through accidental or deliberate breaks in the skin.

Transmission of hepatitis B virus infection is often associated with close interpersonal contact with an infected individual and with crowded living conditions. In such circumstances, transmission by inoculation via routes other than overt percutaneous ones may be quite common.[1] Perinatal transmission of hepatitis B infection from infected mother to child, at or shortly after birth, can occur if the mother is a hepatitis B surface antigen (HBsAg) carrier or if the mother has an acute hepatitis B infection in the third trimester. Infection in infancy by the hepatitis B virus usually leads to the chronic carrier state. Without prophylaxis, infants born to women whose sera are positive for both the hepatitis B surface antigen and the e antigen have an 85-90% likelihood of being infected and becoming a chronic carrier.[5,6] Well-controlled studies have shown that administration of three 0.5 mL doses of Hepatitis B Immune Globulin (Human) - HBIG starting at birth is 75% effective in preventing establishment of the chronic carrier state in these infants during the first year of life.[6] However, the protective effect of HBIG is transient.

Hepatitis B is endemic throughout the world and is a serious medical problem in population groups at increased risk. Because vaccination limited to high-risk individuals has failed to substantially lower the overall incidence of hepatitis B infection, both the Advisory Committee on Immunization Practices (ACIP) and the Committee on Infectious Diseases of the American Academy of Pediatrics (AAP) have also endorsed universal infant immunization as part of a comprehensive strategy for the control of hepatitis B infection.[7,8] In addition, the ACIP also recommends hepatitis B vaccination for all infants and children born after November 21, 1991 and catch-up vaccination of children at high risk of infection (children <11 years of age in households of Pacific Islander ethnicity or of first generation immigrants/refugees from countries with an intermediate or high endemicity of infection).[30] These advisory groups further recommend broad-based vaccination of adolescents. The ACIP recommends that all individuals not previously vaccinated with hepatitis B vaccine be vaccinated at 11-12 years of age with the age-appropriate dose of vaccine and that the vaccination schedule take into account the feasibility of delivering three doses of vaccine to this age group. In addition, older unvaccinated adolescents with identified risk factors for hepatitis B virus infection should also be vaccinated.[30] Similarly, the AAP recommends that universal immunization of all adolescents should be implemented when resources permit with emphasis on those individuals in high-risk settings.[8] A National Institutes of Health Consensus Development Conference Panel on the management of hepatitis C recommends the immunization of all hepatitis C virus (HCV) positive individuals with hepatitis B vaccine.[35] (Refer to INDICATIONS AND USAGE.)

Numerous epidemiological studies have shown that persons who develop anti-HBs following active infection with the hepatitis B virus are protected against the disease on re-exposure to the virus.[9]

Clinical studies have shown that RECOMBIVAX HB when injected into the deltoid muscle induced protective levels of antibody in 96% of 1213 healthy adults who received the recommended 3-dose regimen. Antibody responses varied with age; a protective level of antibody was induced in 98% of 787 young adults 20-29 years of age, 94% of 249 adults 30-39 years of age and in 89% of 177 adults ≥40

2

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                7994328

years of age.[10] Studies with hepatitis B vaccine derived from plasma have shown that a lower response rate (81%) to vaccine may be obtained if the vaccine is administered as a buttock injection.[11] Seroconversion rates and geometric mean antibody titers were measured 1 to 2 months after the third dose. Multiple clinical studies have defined a protective antibody (anti-HBs) level as 1) 10 or more sample ratio units (SRU) as determined by radioimmunoassay or 2) a positive result as determined by enzyme immunoassay.[2] Note: 10 SRU is comparable to 10 mIU/mL of antibody.[12,13,14,15]

RECOMBIVAX HB was shown to be highly immunogenic in clinical studies involving infants, children, and adolescents. Three 5 mcg doses of vaccine induced a protective level of antibody in 100% of 92 infants, 99% of 129 children, and in 99% of 112 adolescents[10] (see DOSAGE AND ADMINISTRATION).

The protective efficacy of three 5 mcg doses of RECOMBIVAX HB has been demonstrated in neonates born of mothers positive for both HBsAg and HBeAg (a core-associated antigenic complex which correlates with high infectivity). In a clinical study of infants who received one dose of HBIG at birth followed by the recommended three-dose regimen of RECOMBIVAX HB, chronic infection had not occurred in 96% of 130 infants after nine months of follow-up.[16] The estimated efficacy in prevention of chronic hepatitis B infection was 95% as compared to the infection rate in untreated historical controls.[17] Significantly fewer neonates became chronically infected when given one dose of HBIG at birth followed by the recommended three-dose regimen of RECOMBIVAX HB when compared to historical controls who received only a single dose of HBIG.[6] Testing for HBsAg and anti-HBs is recommended at 12-15 months of age. If HBsAg is not detectable, and anti-HBs is present, the child has been protected.

As demonstrated in the above study, HBIG, when administered simultaneously with RECOMBIVAX HB at separate body sites, did not interfere with the induction of protective antibodies against hepatitis B virus elicited by the vaccine.

For adolescents (11 through 15 years of age), the immunogenicity of a two-dose regimen (10 mcg at 0 and 4-6 months) was compared with that of the standard three-dose regimen (5 mcg at 0, 1, and 6 months) in an open, randomized, multicenter study. The proportion of adolescents receiving the two-dose regimen who developed a protective level of antibody one month after the last dose (99% of 255 subjects) appears similar to that among adolescents who received the three-dose regimen (98% of 121 subjects). After adolescents (11 through 15 years of age) received the first 10-mcg dose of the two-dose regimen, the proportion who developed a protective level of antibody was approximately 72%.[10]

In one published study, the seroprotection rates in individuals with chronic HCV infection given the standard regimen of RECOMBIVAX HB was approximately 70%.[36] In a second published study of intravenous drug users given an accelerated schedule of RECOMBIVAX HB, infection with HCV did not affect the response to RECOMBIVAX HB.[37]

As with other hepatitis B vaccines, the duration of the protective effect of RECOMBIVAX HB in healthy vaccinees is unknown at present, and the need for booster doses is not yet defined. However, long-term follow-up (5 to 9 years) of approximately 3000 high-risk vaccinees (infants of carrier mothers, male homosexuals, Alaskan Natives) who developed an anti-HBs titer of ≥10 mIU/mL when given a similar plasma-derived vaccine at intervals of 0, 1, and 6 months showed that no subjects developed clinically apparent hepatitis B infection and that 5 subjects developed antigenemia, even though up to half of the subjects failed to maintain a titer at this level.[18-21] Persistence of vaccine-induced immunologic memory among healthy vaccinees who responded to a primary course of plasma-derived or recombinant hepatitis B vaccine has been demonstrated by an anamnestic antibody response to a booster dose of RECOMBIVAX HB given 5-12 years later.[22]

*Predialysis and Dialysis Patients*

Predialysis and dialysis adult patients respond less well to hepatitis B vaccines than do healthy individuals; however, vaccination of adult patients early in the course of their renal disease produces higher seroconversion rates than vaccination after dialysis has been initiated.[30] In addition, the responses to these vaccines may be lower if the vaccine is administered as a buttock injection. When 40 mcg of Hepatitis B Vaccine (Recombinant), was administered in the deltoid muscle, 89% of 28 participants developed anti-HBs with 86% achieving levels ≥10 mIU/mL. However, when the same dosage of this vaccine was administered inappropriately either in the buttock or a combination of buttock and deltoid, 62% of 47 participants developed anti-HBs with 55% achieving levels of ≥10 mIU/mL.[10]

A booster dose or revaccination with RECOMBIVAX HB Dialysis Formulation may be considered in predialysis/dialysis patients if the anti-HBs level is less than 10 mIU/mL.[23]

Reports in the literature describe a more virulent form of hepatitis B associated with superinfections or coinfections by delta virus, an incomplete RNA virus. Delta virus can only infect and cause illness in persons infected with hepatitis B virus since the delta agent requires a coat of HBsAg in order to become

3

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                          7994328

infectious. Therefore, persons immune to hepatitis B virus infection should also be immune to delta virus infection.[2]

*Interchangeability of Plasma-Derived and Recombinant Hepatitis B Vaccines*

Although there have been no clinical studies in which a three-dose vaccine series was initiated with HEPTAVAX-B* (Hepatitis B Vaccine) and completed with RECOMBIVAX HB, or vice versa, extensive *in vitro* and *in vivo* studies have demonstrated that these two vaccines are immunologically comparable.[22,24-28]

## INDICATIONS AND USAGE

**RECOMBIVAX HB** is indicated for vaccination against infection caused by all known subtypes of hepatitis B virus. **RECOMBIVAX HB Dialysis Formulation** is indicated for vaccination of adult predialysis and dialysis patients against infection caused by all known subtypes of hepatitis B virus.

Vaccination with RECOMBIVAX HB is recommended for:

1) Infants including those born to HBsAg positive mothers (high-risk infants).
2) Children born after November 21, 1991.[30]
3) Adolescents (see CLINICAL PHARMACOLOGY).
4) Other persons of all ages in areas of high prevalence or those who are or may be at increased risk of infection with hepatitis B virus, such as:[30]

• *Health Care Personnel*

Dentists and oral surgeons.
Physicians and surgeons.
Nurses.
Paramedical personnel and custodial staff who may be exposed to the virus via blood or other patient specimens.
Dental hygienists and dental nurses.
Laboratory personnel handling blood, blood products, and other patient specimens.
Dental, medical and nursing students.

• *Selected Patients and Patient Contacts*

Staff in hemodialysis units and hematology/oncology units.
Hemodialysis patients and patients with early renal failure before they require hemodialysis.
Patients requiring frequent and/or large volume blood transfusions or clotting factor concentrates (e.g., persons with hemophilia, thalassemia).
Individuals with hepatitis C virus infection.[35]
Clients (residents) and staff of institutions for the mentally handicapped.
Classroom contacts of deinstitutionalized mentally handicapped persons who have persistent hepatitis B surface antigenemia and who show aggressive behavior.
Household and other intimate contacts of persons with persistent hepatitis B surface antigenemia.

• *Sub-populations with a known high incidence of the disease, such as:*

Alaskan Natives.
Pacific Islanders.
Refugees from areas where hepatitis B virus infection is endemic.
Adoptees from countries where hepatitis B virus infection is endemic.

• *International Travelers*
• *Military Personnel identified as being at increased risk*
• *Morticians and Embalmers*
• *Blood bank and plasma fractionation workers*
• *Persons at Increased Risk of the Disease Due to Their Sexual Practices, such as:*

Persons who have heterosexual activity with multiple partners.
Persons who repeatedly contract sexually transmitted diseases.
Homosexual and bisexual adolescent and adult men.
Female prostitutes.

• *Prisoners*
• *Injection drug users*

Neither dosage strength will prevent hepatitis caused by other agents, such as hepatitis A virus, hepatitis C virus, hepatitis E virus or other viruses known to infect the liver.

*Revaccination*

See CLINICAL PHARMACOLOGY.

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                   7994328

*Use with Other Vaccines*

Results from clinical studies indicate that RECOMBIVAX HB can be administered concomitantly with DTP (Diphtheria, Tetanus and whole cell Pertussis), OPV (oral Poliomyelitis vaccine), M-M-R® II (Measles, Mumps, and Rubella Virus Vaccine Live), Liquid PedvaxHIB* [Haemophilus b Conjugate Vaccine (Meningococcal Protein Conjugate)] or a booster dose of DTaP [Diphtheria, Tetanus, acellular Pertussis], using separate sites and syringes for injectable vaccines. No impairment of immune response to individually tested vaccine antigens was demonstrated.

The type, frequency and severity of adverse experiences observed in these studies with RECOMBIVAX HB were similar to those seen when the other vaccines were given alone.

In addition, an HBsAg-containing product, COMVAX* [Haemophilus b Conjugate (Meningococcal Protein Conjugate) and Hepatitis B (Recombinant) Vaccine], was given concomitantly with eIPV (enhanced inactivated Poliovirus vaccine) or VARIVAX* [Varicella Virus Vaccine Live (Oka/Merck)], using separate sites and syringes for injectable vaccines. No impairment of immune response to these individually tested vaccine antigens was demonstrated. No serious vaccine-related adverse events were reported.

COMVAX has also been administered concomitantly with the primary series of DTaP to a limited number of infants. No serious vaccine-related adverse events were reported.[10]

Separate sites and syringes should be used for simultaneous administration of injectable vaccines.

## CONTRAINDICATIONS

Hypersensitivity to yeast or any component of the vaccine.

## WARNINGS

Patients who develop symptoms suggestive of hypersensitivity after an injection should not receive further injections of the vaccine (see CONTRAINDICATIONS).

Because of the long incubation period for hepatitis B, it is possible for unrecognized infection to be present at the time the vaccine is given. The vaccine may not prevent hepatitis B in such patients.

## PRECAUTIONS

*General*

As with any percutaneous vaccine, epinephrine (1:1000) should be available for immediate use should an anaphylactoid reaction occur.

Any serious active infection including febrile illness is reason for delaying use of the vaccine except when in the opinion of the physician, withholding the vaccine entails a greater risk.

Caution and appropriate care should be exercised in administering the vaccine to individuals with severely compromised cardiopulmonary status or to others in whom a febrile or systemic reaction could pose a significant risk.

*Instructions to Healthcare Provider*

The healthcare provider should determine the current health status and previous vaccination history of the vaccinee.

The healthcare provider should question the patient, parent or guardian about reactions to a previous dose of RECOMBIVAX HB or other hepatitis B vaccines.

The healthcare provider must record in the patient's permanent record: the manufacturer, lot number, date of administration, and the name and address of the person administering the vaccine.

Injection of a blood vessel should be avoided.

*Information for Vaccine Recipients and Parents/Guardians*

The healthcare provider should provide the vaccine information required to be given with each vaccination to the patient, parent or guardian.

The healthcare provider should inform the patient, parent or guardian of the benefits and risks associated with vaccination, as well as the importance of completing the immunization series. For risks associated with vaccination, see WARNINGS, PRECAUTIONS, and ADVERSE REACTIONS.

Patients, parents and guardians should be instructed to report any serious adverse reactions to their healthcare provider, who in turn should report such events to the U.S. Department of Health and Human Services through the Vaccine Adverse Event Reporting System (VAERS), 1-800-822-7967.[31] The healthcare provider should inform the parent or guardian of the National Vaccine Injury Compensation Program (NVICP), 1-800-338-2382.

*Drug Interactions*

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                    7994328

There are no known drug interactions. (See INDICATIONS AND USAGE, *Use with Other Vaccines.*)

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

RECOMBIVAX HB has not been evaluated for its carcinogenic or mutagenic potential, or its potential to impair fertility.

*Pregnancy*

*Pregnancy Category C:* Animal reproduction studies have not been conducted with the vaccine. It is also not known whether the vaccine can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. The vaccine should be given to a pregnant woman only if clearly needed.

*Nursing Mothers*

It is not known whether the vaccine is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when the vaccine is administered to a nursing woman.

*Pediatric Use*

RECOMBIVAX HB has been shown to be usually well-tolerated and highly immunogenic in infants and children of all ages. Newborns also respond well; maternally transferred antibodies do not interfere with the active immune response to the vaccine. See DOSAGE AND ADMINISTRATION for recommended pediatric dosage and for recommended dosage for infants born to HBsAg positive mothers.

The safety and effectiveness of RECOMBIVAX HB Dialysis Formulation in children have not been established.

*Geriatric Use*

Clinical studies of RECOMBIVAX HB did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reports from the clinical literature indicate that hepatitis B vaccines are less immunogenic in adults aged 65 years or older than in younger individuals.[32] No overall differences in safety were observed between these subjects and younger subjects.

## ADVERSE REACTIONS

RECOMBIVAX HB and RECOMBIVAX HB Dialysis Formulation are generally well-tolerated. No serious adverse reactions attributable to the vaccine have been reported during the course of clinical trials. No adverse experiences were reported during clinical trials which could be related to changes in the titers of antibodies to yeast. As with any vaccine, there is the possibility that broad use of the vaccine could reveal adverse reactions not observed in clinical trials.

In three clinical studies, 434 doses of RECOMBIVAX HB, 5 mcg, were administered to 147 healthy infants and children (up to 10 years of age) who were monitored for 5 days after each dose. Injection site reactions and systemic complaints were reported following 0.2% and 10.4% of the injections, respectively. The most frequently reported systemic adverse reactions (>1% injections), in decreasing order of frequency, were irritability, fever (≥101°F oral equivalent), diarrhea, fatigue/weakness, diminished appetite, and rhinitis.[10]

In a study that compared the three-dose regimen (5 mcg) with the two-dose regimen (10 mcg) of RECOMBIVAX HB in adolescents, the overall frequency of adverse reactions was generally similar.

In a group of studies, 3258 doses of RECOMBIVAX HB, 10 mcg, were administered to 1252 healthy adults who were monitored for 5 days after each dose. Injection site reactions and systemic complaints were reported following 17% and 15% of the injections, respectively. The following adverse reactions were reported:

*Incidence Equal To or Greater Than 1% of Injections*

LOCAL REACTION (INJECTION SITE)
Injection site reactions consisting principally of soreness, and including pain, tenderness, pruritus, erythema, ecchymosis, swelling, warmth, and nodule formation.

*BODY AS A WHOLE*
The most frequent systemic complaints include fatigue/weakness; headache; fever (≥100°F); and malaise.

*DIGESTIVE SYSTEM*
Nausea; and diarrhea

*RESPIRATORY SYSTEM*
Pharyngitis; and upper respiratory infection

*Incidence Less Than 1% of Injections*

*BODY AS A WHOLE*
Sweating; achiness; sensation of warmth; lightheadedness; chills; and flushing

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                          7994328

*DIGESTIVE SYSTEM*
Vomiting; abdominal pains/cramps; dyspepsia; and diminished appetite
*RESPIRATORY SYSTEM*
Rhinitis; influenza; and cough
*NERVOUS SYSTEM*
Vertigo/dizziness; and paresthesia
*INTEGUMENTARY SYSTEM*
Pruritus; rash (non-specified); angioedema; and urticaria
*MUSCULOSKELETAL SYSTEM*
Arthralgia including monoarticular; myalgia; back pain; neck pain; shoulder pain; and neck stiffness
*HEMIC/LYMPHATIC SYSTEM*
Lymphadenopathy
*PSYCHIATRIC/BEHAVIORAL*
Insomnia/disturbed sleep
*SPECIAL SENSES*
Earache
*UROGENITAL SYSTEM*
Dysuria
*CARDIOVASCULAR SYSTEM*
Hypotension

*Marketed Experience*

The following additional adverse reactions have been reported with use of the marketed vaccine. In many instances, the relationship to the vaccine was unclear.
*Hypersensitivity*

Anaphylaxis and symptoms of immediate hypersensitivity reactions including rash, pruritus, urticaria, edema, angioedema, dyspnea, chest discomfort, bronchial spasm, palpitation, or symptoms consistent with a hypotensive episode have been reported within the first few hours after vaccination. An apparent hypersensitivity syndrome (serum-sickness-like) of delayed onset has been reported days to weeks after vaccination, including: arthralgia/arthritis (usually transient), fever, and dermatologic reactions such as urticaria, erythema multiforme, ecchymoses and erythema nodosum (see WARNINGS and PRECAUTIONS).
*Digestive System*

Elevation of liver enzymes; constipation
*Nervous System*

Guillain-Barré Syndrome; multiple sclerosis; exacerbation of multiple sclerosis; myelitis including transverse myelitis; seizure; febrile seizure; peripheral neuropathy including Bell's Palsy; radiculopathy; herpes zoster; migraine; muscle weakness; hypesthesia; encephalitis
*Integumentary System*

Stevens-Johnson Syndrome; alopecia; petechiae
*Musculoskeletal System*

Arthritis
*Hematologic*

Increased erythrocyte sedimentation rate; thrombocytopenia
*Immune System*

Systemic lupus erythematosus (SLE); lupus-like syndrome; vasculitis
*Psychiatric/Behavioral*

Irritability; agitation; somnolence
*Special Senses*

Optic neuritis; tinnitus; conjunctivitis; visual disturbances
*Cardiovascular System*

Syncope; tachycardia.

The following adverse reaction has been reported with another Hepatitis B Vaccine (Recombinant) but not with RECOMBIVAX HB: keratitis.

Patients, parents and guardians should be instructed to report any serious adverse reactions to their healthcare provider, who in turn should report such events to the U.S. Department of Health and Human Services through the Vaccine Adverse Event Reporting System (VAERS), 1-800-822-7967.[31]

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                7994328

**DOSAGE AND ADMINISTRATION**

*Do not inject intravenously or intradermally.*

*RECOMBIVAX HB Hepatitis B Vaccine (Recombinant) DIALYSIS FORMULATION [(40 mcg/mL) (WITHOUT PRESERVATIVE)] IS INTENDED ONLY FOR ADULT PREDIALYSIS/DIALYSIS PATIENTS.*

*RECOMBIVAX HB Hepatitis B Vaccine (Recombinant) PEDIATRIC/ADOLESCENT (WITHOUT PRESERVATIVE) and ADULT FORMULATIONS (WITHOUT PRESERVATIVE) ARE NOT INTENDED FOR USE IN PREDIALYSIS/DIALYSIS PATIENTS.*

*Three-Dose Regimen*

The vaccination regimen for each population consists of 3 doses of vaccine given according to the following schedule:

First dose: at elected date
Second dose: 1 month later
Third dose: 6 months after the first dose

For infants born of mothers who are HBsAg positive or mothers of unknown HBsAg status, treatment recommendations are described in the subsection titled: *Guidelines For Treatment of Infants Born of HBsAg Positive Mothers or Mothers of Unknown HBsAg Status.*

*Two-Dose Regimen – Adolescents (11 through 15 years of age)*

An alternate two-dose regimen is available for routine vaccination of adolescents (11 through 15 years of age). The regimen consists of two doses of vaccine (10 mcg) given according to the following schedule:

First injection: at elected date
Second injection: 4-6 months later

Table 1 summarizes the dose and formulation of RECOMBIVAX HB for specific populations, regardless of the risk of infection with hepatitis B virus.

Table 1

| Group | Dose/Regimen | Formulation | Color Code |
|---|---|---|---|
| Infants, Children and Adolescents 0-19 years of age | 5 mcg (0.5 mL) 3 x 5 mcg | Pediatric/Adolescent | Yellow |
| Adolescents* 11 through 15 years of age | 10 mcg** (1.0 mL) 2 x 10 mcg | Adult | Green |
| Adults ≥20 years of age | 10 mcg** (1.0 mL) 3 x 10 mcg | Adult | Green |
| Predialysis and Dialysis Patients† | 40 mcg (1.0 mL) 3 x 40 mcg | Dialysis | Blue |

** If the suggested formulation is not available, the appropriate dosage can be achieved from another formulation provided that the total volume of vaccine administered does not exceed 1 mL. However, the Dialysis Formulation may be used only for adult predialysis/dialysis patients.

* Adolescents (11 through 15 years of age) may receive either regimen: the 3 x 5 mcg (Pediatric/Adolescent Formulation) or the 2 x 10 mcg (Adult Formulation).

† See also recommendations for revaccination of predialysis and dialysis patients in DOSAGE AND ADMINISTRATION, *Revaccination.*

RECOMBIVAX HB is for intramuscular injection. The *deltoid muscle* is the preferred site for intramuscular injection in adults. Data suggest that injections given in the buttocks frequently are given into fatty tissue instead of into muscle. Such injections have resulted in a lower seroconversion rate than was expected. The *anterolateral thigh* is the recommended site for intramuscular injection in infants and young children.

For persons at risk of hemorrhage following intramuscular injection, RECOMBIVAX HB may be administered subcutaneously. However, when other aluminum-adsorbed vaccines have been administered subcutaneously, an increased incidence of local reactions including subcutaneous nodules has been observed. Therefore, subcutaneous administration should be used only in persons (e.g., hemophiliacs) who are at risk of hemorrhage following intramuscular injections.

The vaccine should be used as supplied; no dilution or reconstitution is necessary. The full recommended dose of the vaccine should be used.

*For All Formulations:* Since none of the formulations contain a preservative, once the single-dose vial has been penetrated, the withdrawn vaccine should be used promptly, and the vial must be discarded.

Shake well before use. Thorough agitation at the time of administration is necessary to maintain suspension of the vaccine.

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                        7994328

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration. After thorough agitation, the vaccine is a slightly opaque, white suspension.

Withdraw the recommended dose from the vial using a sterile needle and syringe free of preservatives, antiseptics, and detergents.

It is important to use a separate sterile syringe and needle for each individual patient to prevent transmission of hepatitis and other infectious agents from one person to another. Needles should be disposed of properly and should not be recapped.

Injection must be accomplished with a needle long enough to ensure intramuscular deposition of the vaccine.

*Guidelines For Treatment of Infants Born of HBsAg Positive Mothers or Mothers of Unknown HBsAg Status*

Each infant should receive three 5 mcg doses of RECOMBIVAX HB irrespective of the mother's HBsAg status (see Table 1). The ACIP recommends that if the mother is determined to be HBsAg positive within 7 days of delivery, the infant also should be given a dose of HBIG (0.5 mL) immediately. The first dose of RECOMBIVAX HB may be given at the same time as HBIG, but it should be administered in the opposite anterolateral thigh.[7]

*Revaccination*

The duration of the protective effect of RECOMBIVAX HB in healthy vaccinees is unknown at present and the need for booster doses is not yet defined (see CLINICAL PHARMACOLOGY).

A booster dose or revaccination with RECOMBIVAX HB Dialysis Formulation (blue color code) may be considered in predialysis/dialysis patients if the anti-HBs level is less than 10 mIU/mL 1 to 2 months after the third dose.[23] The ACIP recommends that the need for booster doses of vaccine should be assessed by annual antibody testing and a booster dose given when antibody levels decline to <10 mIU/mL.[30]

*Known or Presumed Exposure to HBsAg*

There are no prospective studies directly testing the efficacy of a combination of HBIG and RECOMBIVAX HB in preventing clinical hepatitis B following percutaneous, ocular or mucous membrane exposure to hepatitis B virus. However, since most persons with such exposures (e.g., health-care workers) are candidates for RECOMBIVAX HB and since combined HBIG plus vaccine is more efficacious than HBIG alone in perinatal exposures, the following guidelines are recommended for persons who have been exposed to hepatitis B virus such as through (1) percutaneous (needlestick), ocular, mucous membrane exposure to blood known or presumed to contain HBsAg, (2) human bites by known or presumed HBsAg carriers, that penetrate the skin, or (3) following intimate sexual contact with known or presumed HBsAg carriers.

HBIG (0.06 mL/kg) should be given intramuscularly as soon as possible after exposure and within 24 hours if possible. RECOMBIVAX HB (see dosage recommendation) should be given intramuscularly at a separate site within 7 days of exposure and second and third doses given one and six months, respectively, after the first dose.


**HOW SUPPLIED**

PEDIATRIC/ADOLESCENT FORMULATION (PRESERVATIVE-FREE)

No. 4980 — RECOMBIVAX HB for use in infants, children, and adolescents is supplied as 5 mcg/0.5 mL of HBsAg in a 0.5 mL single-dose vial, color coded with a yellow cap and stripe on the vial labels and cartons and an orange banner on the vial labels and cartons stating "Preservative Free", **NDC** 0006-4980-00.

No. 4981 — RECOMBIVAX HB for use in infants, children, and adolescents is supplied as 5 mcg/0.5 mL of HBsAg in a 0.5 mL single-dose vial, in a box of 10 single-dose vials, color coded with a yellow cap and stripe on the vial labels and cartons and an orange banner on the vial labels and cartons stating "Preservative Free", **NDC** 0006-4981-00.

ADULT FORMULATION (PRESERVATIVE-FREE)

No. 4995 — RECOMBIVAX HB for use in adults and adolescents (11 through 15 years of age) is supplied as 10 mcg/mL of HBsAg in a 1 mL single-dose vial, color coded with a green cap and stripe on the vial labels and cartons and an orange banner on the vial labels and cartons stating "Preservative Free", **NDC** 0006-4995-00.

No. 4995 — RECOMBIVAX HB for use in adults and adolescents (11 through 15 years of age) is supplied as 10 mcg/mL of HBsAg in a 1 mL single-dose vial, in a box of 10 single-dose vials, color coded with a green cap and stripe on the vial labels and cartons and an orange banner on the vial labels and cartons stating "Preservative Free", **NDC** 0006-4995-41.

DIALYSIS FORMULATION (PRESERVATIVE FREE)

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                            7994328

No. 4992 — RECOMBIVAX HB Dialysis Formulation is supplied as 40 mcg/mL of HBsAg in a 1 mL single-dose vial, color coded with a blue cap and stripe on the vial labels and cartons and an orange banner on the vial labels and cartons stating "Preservative Free", **NDC** 0006-4992-00.

*Storage*

Store vials and syringes at 2-8°C (36-46°F). Storage above or below the recommended temperature may reduce potency.

*Do not freeze since freezing destroys potency.*

## REFERENCES

1. Robinson, W.S.: Hepatitis B Virus and the Delta Virus, in "Principles and Practice of Infectious Diseases," G.L. Mandell; R.G. Douglas; J.E. Bennett (eds), vol. 2, New York, John Wiley & Sons, 1002-1029, 1985.

2. Recommendation of the Immunization Practices Advisory Committee (ACIP): Protection Against Viral Hepatitis, MMWR *39*(RR-2): 5-22, Feb. 9, 1990.

3. Balistreri, W.F.: Viral Hepatitis, Unique Aspects of Infection During Childhood, Consultant *24*(4): 131-153 passim, April 1984.

4. Robinson, W.S.: Hepatitis B Virus and Hepatitis Delta Virus, in "Principles and Practice of Infectious Diseases," G.L. Mandell, R.G. Douglas, and J.E. Bennett (eds), Churchill Livingstone, 1204-1231, 1990.

5. Stevens, C.E.; Toy, P.T.; Tong, M.J.; Taylor, P.E.; Vyas, G.N.; Nair, P.V.; Gudavalli, M.; Krugman, S.: Perinatal Hepatitis B Virus Transmission in the United States, JAMA *253*(12): 1740-1745, 1985.

6. Beasley, R.P.; Hwang, L.; Stevens, C.E.; Lin, C.; Hsieh, F.; Wang, K.; Sun, T.; Szmuness, W.: Efficacy of Hepatitis B Immune Globulin for Prevention of Perinatal Transmission of the Hepatitis B Virus Carrier State: Final Report of a Randomized Double-Blind, Placebo-Controlled Trial, Hepatology *3:* 135-141, 1983.

7. Recommendations of the Immunization Practices Advisory Committee (ACIP): Hepatitis B Virus: A Comprehensive Strategy for Eliminating Transmission in the United States Through Universal Childhood Vaccination, MMWR *40*(RR-13): 1-25, November 22, 1991.

8. Universal Hepatitis B Immunization, Committee on Infectious Diseases, Pediatrics *89*(4): 795-800, 1992.

9. Melnick, J.L.: Historical Aspects of Hepatitis B Vaccine, in "Hepatitis B Vaccine INSERM Symposium No. 18," P. Maupas and P. Guesry (eds), Elsevier/North-Holland Biomedical Press, 23-31, 1981.

10. Data on file at Merck Research Laboratories.

11. Centers for Disease Control: Suboptimal Response to Hepatitis B Vaccine Given by Injection into the Buttock. MMWR *34*(8): 105-113, March 1, 1985.

12. Hadler, S.C., et al.: Long-term Immunogenicity and Efficacy of Hepatitis B Vaccine in Homosexual Men, NEJM *315*: 209-214, 1986.

13. Szmuness, W.; Stevens, C.E.; Horley, H.J., et al.: Hepatitis B Vaccine. Demonstration of Efficacy in a Controlled Clinical Trial in a High-risk Population in the United States. NEJM *303:* 833-841, 1980.

14. Francis, D.P.; Hadler, S.C.; Thompson, S.E., et al.: The Prevention of Hepatitis B with Vaccine. Report of the Centers for Disease Control Multi-center Efficacy Trial among Homosexual Men. Ann. Int. Med. *97:* 362-366, 1982.

15. Szmuness, W.; Stevens, C.E.; Horley, H.J., et al.: Hepatitis B Vaccine in Medical Staff of Hemodialysis Units. Efficacy and Subtype Cross-protection, NEJM *307:* 1481-1486, 1982.

16. Stevens, C.E.; Taylor, P.E.; Tong, M.J., et al.: Prevention of Perinatal Hepatitis B Virus Infection with Hepatitis B Immune Globulin and Hepatitis B Vaccine, in Zuckerman, A.J. (ed.), "Viral Hepatitis and Liver Diseases", Alan R. Liss, 982-983, 1988.

17. Stevens, C.E.; Taylor, P.E.; Tong, M.J., et al.: Yeast-Recombinant Hepatitis B Vaccine, Efficacy with Hepatitis B Immune Globulin in Prevention of Perinatal Hepatitis B Virus Transmission, JAMA *257*(19): 2612-2616, 1987.

18. Wainwright, R.B.; McMahon, B.J.; Bulkow, L.R., et al.: Duration of Immunogenicity and Efficacy of Hepatitis B Vaccine in a Yupik Eskimo Population, Preliminary Results of an 8-Year Study, in "Viral Hepatitis and Liver Disease," F.B. Hollinger, S.M. Lemon, and H. Margolis (eds), Williams & Wilkins, 762-766, 1990.

19. Hadler, S.C.; Coleman, P.J.; O'Malley, P., et al.: Evaluation of Long-Term Protection by Hepatitis B Vaccine for Seven to Nine Years in Homosexual Men, in "Viral Hepatitis and Liver Disease," F.B. Hollinger, S.M. Lemon, and H. Margolis (eds), Williams & Wilkins, 766-768, 1990.

20. Tong, M.J.; Stevens, C.E.; Taylor, P.E., et al.: Prevention of Hepatitis B Infection in Infants Born to HBeAg Positive HBsAg Carrier Mothers in the United States, in "An Update, 1989, Progress in Hepatitis B Immunization," P. Coursaget and M.J. Tong (eds), Colloque INSERM/John Libbey Eurotext Ltd., Vol. 194, 339-345, 1990.

21. Hwang, L-Y.; Lee, C-Y.; and Beasley, R.P.: Five-Year Follow-up of HBV Vaccination with Plasma-derived Vaccine in Neonates: Evaluation of Immunogenicity and Efficacy Against Perinatal Transmission, in "Viral Hepatitis and Liver Disease," F.B. Hollinger, S.M. Lemon, and H. Margolis (eds), Williams & Wilkins, 759-761, 1990.

RECOMBIVAX HB®
Hepatitis B Vaccine (Recombinant)                                                7994328

22. West, D.J.; Calandra, G.B.: Vaccine Induced Immunologic Memory for Hepatitis B Surface Antigen; Implications for Policy on Booster Vaccination, Vaccine, *14*(11): 1019-1027, 1996.

23. Recommendations of the Immunization Practices Advisory Committee (ACIP): Update on Hepatitis B Prevention, MMWR *36*(23): 353-366, June 19, 1987.

24. Emini, E.A.; Ellis, R.W.; Miller, W.J.; McAleer, W.J.; Scolnick, E.M. and Gerety, R.J.: Production and Immunological Analysis of Recombinant Hepatitis B Vaccine, J. Infection, *13*(Sup. A): 3-9, 1986.

25. Brown, S.E.; Stanley, C.; Howard, C.R.; Zuckerman, A.J.; Steward, M.W.: Antibody Responses to Recombinant and Plasma-derived Hepatitis B Vaccines, Brit. Med. J., *292:* 159-161, 1986.

26. Yamamoto, S.; Kuroki, T.; Kurai, K.; Iino, S.: Comparison of Results for Phase I Studies with Recombinant and Plasma-derived Hepatitis B Vaccines, and Controlled Study Comparing Intramuscular and Subcutaneous Injections of Recombinant Hepatitis B Vaccine, J. Infection, *13*(Sup. A): 53-60, 1986.

27. Jilg, W.; Schmidt, M.; Zoulek, G.; Lorbeer, B.; Wilske, B.; Deinhardt, F.: Clinical Evaluation of a Recombinant Hepatitis B Vaccine, Lancet, 1174-1175, Nov. 24, 1984.

28. Schalm, S.W.; Heytink, R.A.; Kruining, H.; Bakker-Bendik, M.: Immunogenicity of Recombinant Yeast Hepatitis-B Vaccine, Neth. J. Med. *29:* 28, 1986.

29. Centers for Disease Control: Epidemiology and Prevention of Vaccine-preventative Diseases, W. Atkinson, L. Furphy, J. Gantt, M. Mayfield, G. Phyne (eds), chapter 9.

30. Recommendations of the Advisory Committee on Immunization Practices (ACIP): Hepatitis B Virus Infection: A Comprehensive Strategy to Eliminate Transmission in the United States, 1996 update, MMWR (draft January 13, 1996).

31. Vaccine Adverse Event Reporting System - United States. MMWR *39*(41): 730-733, October 19, 1990.

32. Zajac, B.A.; West, D.J.; McAleer, W.J.; Scolnick, E.M.: Overview of Clinical Studies with Hepatitis B Vaccine Made by Recombinant DNA, J. Infection, *13*(Sup. A): 39-45, July 1986.

33. WHO Bulletin, Expanded Programme on Immunization, Hepatitis B Vaccine – Making Global Progress. October, 1996.

34. Centers for Disease Control and Prevention, Federal Register, February 23, 1999, *64*(35): 9044-9045.

35. National Institutes of Health, National Institutes of Health Consensus Development Conference Panel Statement: Management of Hepatitis C, Hepatology, *26*(Suppl. 1): 2S-10S, 1997.

36. Wiedmann, M.; Liebert, U.G.; Oesen, U.; Porst, H.; Wiese, M.; Schroeder, S.; Halm, U.; Mossner, J.; Berr, F.: Decreased Immunogenicity of Recombinant Hepatitis B Vaccine in Chronic Hepatitis C, Hepatology, *31:* 230-234, 2000.

37. Minniti, F.; Baldo, V.; Trivello, R.; Bricolo, R.; Di Furia, L.; Renzulli, G.; Chiaramonte, M.: Response to HBV vaccine in Relation to anti-HCV and anti-HBc Positivity: a Study in Intravenous Drug Addicts, Vaccine, *17:* 3083-3085, 1999.

Manuf. and Dist. by:

**MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

Issued August 2004
Printed in USA